[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-13163

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 6, 2009
THOMAS K. KAHN
CLERK

D.C. Docket No. 05-00119-CR-F-N

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DON EUGENE SIEGELMAN,
RICHARD SCRUSHY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Alabama

_____

(March 6, 2009)

Before EDMONDSON, Chief Judge, TJOFLAT and HILL, Circuit Judges.

PER CURIAM:

Don Eugene Siegelman is the former Governor of Alabama. Richard Scrushy is the founder and former Chief Executive Officer of HealthSouth Corporation, a major hospital corporation with operations throughout Alabama. The defendants were convicted of federal funds bribery, in violation of 18 U.S.C. § 666(a)(1)(B), and five counts of honest services mail fraud and conspiracy, in violation of 18 U.S.C. §§ 1341, 1346, and 18 U.S.C. § 371. Siegelman was also convicted of obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3).

The defendants' bribery convictions were based on allegations that they made and executed a corrupt agreement whereby Scrushy gave Siegelman $500,000 in exchange for Siegelman's appointing him to Alabama's Certificate of Need Review Board (the "CON" Board). The honest services mail fraud convictions incorporated the same bribery allegations, but also alleged that Scrushy used the CON Board seat obtained from Siegelman to further HealthSouth's interests. Siegelman's obstruction of justice conviction is based on allegations that he corruptly influenced another to create a series of sham check transactions to cover up a "pay-to-play" payment to him.[1]

---

[1]The obstruction of justice allegations involved conduct unrelated to the Siegelman-Scrushy bribery, mail fraud and conspiracy charges.

This is an extraordinary case. It involves allegations of corruption at the highest levels of Alabama state government. Its resolution has strained the resources of both Alabama and the federal government.

But it has arrived in this court with the "sword and buckler" of a jury verdict. The yeoman's work of our judicial system is done by a single judge and a jury. Twelve ordinary citizens of Alabama are asked to sit through long days of often tedious and obscure testimony and pore over countless documents to decide what happened, and, having done so, to apply to these facts the law as the judge has explained it to them. And they do. Often at great personal sacrifice. Though the popular culture sometimes asserts otherwise, the virtue of our jury system is that it most often gets it right. This is the great achievement of our system of justice. The jury's verdict commands the respect of this court, and that verdict must be sustained if there is substantial evidence to support it. *Glasser v. United States*, 315 U.S. 60, 80 (1942).

Furthermore, to the extent that the jury's verdict rests upon their evaluations of the credibility of individual witnesses, and the reasonable inferences to be drawn from that testimony, we owe deference to those decisions. In our system, the jury decides what the facts are, by listening to the witnesses and making judgments about whom to believe. This they have done, and, though invited to do

3

so,[2] we shall not substitute our judgment for theirs.

This is not to say that the judgment below is inviolable. Our duty as an appellate court is to answer properly presented questions from the parties in the case as to whether the law was correctly interpreted and applied by the district court. Juries apply the law as the judge instructs them, and the defendants' lawyers assert that there were errors in those instructions. Defendants also contend that there were other legal mistakes committed during the course of this trial. With this in mind, we have reviewed the claims of legal error in the proceedings below, and our opinion as to their merit follows. First, however, we recount the facts as the jury found them.[3]

## I.

Don Siegelman was elected Governor of Alabama in 1998 on a campaign platform that advocated the establishment of a state lottery to help fund education in Alabama. After his election, he established the Alabama Education Lottery Foundation (the "Foundation") to raise money to campaign for voter approval of a ballot initiative to establish a state lottery. Darren Cline, the Foundation's

---

[2]The defendants assert that this is a case in which we owe no deference to the jury's findings of fact, but we disagree.

[3]Where the jury need not have found a particular fact to be established in order to reach their verdict, we indicate who testified to that fact.

fundraising director, testified that Siegelman "called the shots" on the lottery campaign. The lottery initiative was eventually defeated in a referendum held in October of 1999.

On March 9, 2000, the Foundation borrowed $730,789.29 from an Alabama bank in order to pay down debt incurred by the Alabama Democratic Party for get-out-the-vote expenses during the lottery campaign. This note was personally and unconditionally guaranteed by Siegelman.[4]

Richard Scrushy, the CEO of HealthSouth had served on the CON Board under three previous governors of Alabama. The CON Board is an arm of the State Health Planning and Development Agency and exists to prevent unnecessary duplication of healthcare services in Alabama. The Board determines the number of healthcare facilities in Alabama through a process that requires healthcare providers to apply for and obtain a certificate of a healthcare need before opening a new facility or offering a special healthcare service. The CON Board decides which healthcare applications will be approved for an announced healthcare need, choosing between competing applications and ruling on objections filed by an applicant's competitor. The Governor of Alabama has sole discretion to appoint

---

[4]There was another personal guarantor, but each was individually liable.

5

the members of the CON Board, who serve at his pleasure.[5]  Scrushy had supported Siegelman's opponent in the just prior election.

Nick Bailey was one of Siegelman's closest associates and had worked on Siegelman's campaign for governor.  Cline testified that "whatever [Bailey] told me that the Governor wanted was what the Governor said."  Cline also testified that "if the Governor wanted to get something done, then [Bailey] went ahead – blindly went ahead and did it."

Bailey testified that, after Siegelman's election in 1998, Siegelman met with Eric Hanson, an outside lobbyist for HealthSouth, and told Hanson that because Scrushy had contributed at least $350,000 to Siegelman's opponent in the election, Scrushy needed to "do" at least $500,000 in order to "make it right" with the Siegelman campaign.  Bailey testified that Siegelman was referring to the campaign for the lottery initiative, and that Hanson was to relay this conversation to Scrushy.  Bailey also testified that, in another conversation, Hanson told Bailey that Scrushy wanted control of the CON Board.

Mike Martin is the former Chief Financial Officer of HealthSouth.  He testified that having influence over the CON Board was important to Scrushy and HealthSouth because it determined the number of healthcare facilities in the state,

---

[5]Three of the nine seats on the Board are reserved for health care industry providers.

thereby affecting HealthSouth's ability to grow. He testified that Scrushy told him that to "have some influence or a spot on the CON Board," they had to help Siegelman raise money for the lottery campaign. Scrushy said that if they did so, "[they] would be assured a seat on the CON Board." Martin testified, "[W]e were making a contribution . . . in exchange for a spot on the CON Board."

Bailey testified that lobbyist Hanson "made it clear to him that if Mr. Scrushy gave the $500,000 to the lottery campaign that we could not let him down" with respect to the CON Board seat. Bailey also testified that he "reminded the Governor periodically of the conversations that [Bailey] had with Eric Hanson and the conversations that the Governor had with Eric Hanson about what Mr. Scrushy wanted for his contributions, and that was the CON Board."

Martin also testified that Scrushy told him that HealthSouth could not make the payment to the lottery campaign, nor could he do it personally because "we [HealthSouth] had not supported that and that his wife, Leslie, was against the lottery, and it would just look bad if HealthSouth made a direct contribution to the lottery, so we needed to ask – he instructed me in particular to ask our investment banker, Bill McGahan, from [the Swiss bank] UBS, to make the contribution."

Bill McGahan did not want to make such an "out of the norm" donation and hoped the matter would "go away." Over the next two weeks, Martin called

7

McGahan at least once a day to ask him about the status of the UBS donation, and told McGahan that Scrushy was going to fire UBS if it did not make the contribution. Finally, Martin testified, Scrushy himself called McGahan to "put more pressure" on him to make the contribution.

McGahan testified that he did not want UBS to make such a large contribution directly, so he told Martin that he would get Integrated Health Services ("IHS") of Maryland to make the donation to the lottery campaign in exchange for UBS reducing an outstanding fee that IHS owed UBS. IHS agreed to this arrangement and donated $250,000 to the Foundation in exchange for a reduction of $267,000 in the fee it owed UBS.

The IHS "donation" was in the form of a check dated July 19, 1999, made payable from itself to the Foundation. Martin testified that Scrushy told him it was important that he, Scrushy, hand deliver the IHS check to Siegelman, so Martin delivered the check to Scrushy so that he could do so.

Some time later,[6] Siegelman and Scrushy met in Siegelman's office. Bailey testified that after Scrushy left, Siegelman showed the IHS check to Bailey and told him that Scrushy was "halfway there." Bailey asked, "what in the world is he

---

[6]Bailey told the FBI that Scrushy gave the check to Siegelman in a meeting on July 14, 1999, but testified at trial that he did not remember exactly when the meeting was.

[Scrushy] going to want for that?"  Siegelman replied, "the CON Board."  Bailey then asked, "I wouldn't think that would be a problem, would it?"  Siegelman responded, "I wouldn't think so."

Siegelman appointed Scrushy to the CON Board on July 26, 1999 – one week after the date on the IHS check.[7]  Siegelman directed Bailey to contact the Board chair-designee to tell her that Siegelman wanted Scrushy to be vice-chair of the CON Board, and the Board so chose.  Bailey testified that Siegelman made Scrushy vice-chair "[b]ecause [Scrushy] asked for it."  Scrushy stayed on the Board until January of 2001, at which time Siegelman appointed Thom Carman, HealthSouth's vice-president, to the remainder of Scrushy's term.  Siegelman subsequently reappointed Carman to a full term.  While Carman was on the Board, HealthSouth successfully applied for and received Certificates of Need for a mobile PET scanner and a rehabilitation hospital.

Darren Cline, the Foundation's fundraising director, testified that Siegelman gave him the IHS check and told him it was from Scrushy.  Cline was concerned about the amount of the donation from one person, and Siegelman told him to hold the check.  In November of 1999, however, at Siegelman's direction, Bailey retrieved the check and opened a new checking account in the Foundation's name

---

[7]Seven other Board members were appointed that day.

at a Birmingham bank. Bailey made an initial deposit of $275,000 – the $250,000 IHS check and a $25,000 check from another company. Cline was never told.

On March 9, 2000, the Foundation borrowed, from the same Birmingham bank, $730,789.29 to repay the Alabama Democratic Party's debt in connection with the lottery initiative and Siegelman guaranteed the loan. At that time, the Foundation had over $447,000 in its checking account at the bank, $250,000 of which had come from the IHS check deposited in November of 1999. On March 13, 2000, $440,000 was debited from the account to pay down the Foundation's loan.

In May, Siegelman and Bailey traveled to HealthSouth's headquarters in Birmingham, where Siegelman met privately with Scrushy in Scrushy's office. At that meeting, Scrushy gave Siegelman a check issued by HealthSouth for $250,000 payable to the Foundation.[8] On May 23, 2000, the $250,000 check was applied directly against the Foundation's loan balance.

The Foundation was required to disclose contributions received and expenditures made in statements filed with the Alabama Secretary of State. It failed to file timely any disclosure regarding any funds received until July of 2002,

---

[8]HealthSouth's political contributions coordinator testified that she did not know about the donation until she read about it in the newspaper. The Foundation's fundraising director testified that he was not present when Scrushy gave Siegelman either of the checks.

after Alabama newspapers questioned whether the financial dealings between the Foundation and the Alabama Democratic Party had been properly reported and the Secretary of State's Office had written a letter to the state Attorney General's Office about the Foundation's non-disclosure of the payoff of the Democratic Party's campaign loan. All funds received were then reported.

Lanny Young was a long-time business associate of Siegelman's who testified that he was part of a "pay-to-play" arrangement with Siegelman existing over many years. He testified that he would provide money, campaign contributions, and other benefits in return for official action, as needed, that benefitted Young's business interests. He testified that in January of 2000, Siegelman asked him for $9,200 to buy a motorcycle. The evidence was that Siegelman had already purchased the motorcycle. Young testified that he and Bailey worked out the details for the transaction.

Bailey testified that he did not want Young to give the money directly to Siegelman, so Bailey told Young to write the check to him, Bailey, which he deposited into his own account. He then wrote a check to Lori Allen, Siegelman's wife, which he gave to Siegelman and which was deposited into Siegelman's bank account that same day. There was testimony that a check written to the IRS for fourth quarter estimated taxes would not have cleared the account but for the

11

$9200 deposit.

By June of 2001, Siegelman was well-aware of the federal-state investigation into the Foundation's finances and Siegelman's dealings with Young. Bailey and Young each testified that, in an effort to cover up Young's $9,200 payment to Siegelman, Bailey gave Young a check for $10,503.39, on which he noted "repayment of loan [the $9,200] plus interest" in order to make it appear that he had borrowed the $9,200 from Young. Bailey also wrote a check to Siegelman for $2,973.35 with the notation "balance due on m/c" to provide a reason for his borrowing money from Young, which was to purchase the motorcycle from Siegelman. Bailey testified that he did not borrow the money to buy the motorcycle, but that Young's $9,200 had gone through him to Siegelman and "we used the motorcycle to cover it up." Bailey testified that Siegelman was aware of and approved Bailey's writing of the $10,503.39 check to Young.

Bailey testified that he gave Siegelman the $2,973.35 check at the office of Siegelman's attorney, who, along with Bailey's own attorney, was present for the transfer. Neither lawyer was told that the purpose of the transaction was part of the coverup of the $9,200 payment from Young to Siegelman. Siegelman accepted the check, and provided Bailey with a bill of sale for the motorcycle, which the attorneys helped finalize. Bailey testified that he lied about the

12

transaction to the lawyers, that he and Siegelman knew that the federal investigation was going on, and that he later lied to federal investigators about the transaction to protect himself and Siegelman.

## II.

On December 12, 2005, a grand jury returned a second superseding indictment against Siegelman and Scrushy and two other defendants.[9] Both Siegelman and Scrushy were charged with federal funds bribery, honest services conspiracy and honest services mail fraud.[10] Siegelman was also charged with multiple counts of racketeering conspiracy, racketeering, honest services wire fraud, obstruction of justice and extortion.

Trial on the indictment began on May 1, 2006. On June 29, 2006, the jury convicted Siegelman and Scrushy on the bribery, conspiracy and honest services mail fraud counts, and Siegelman was convicted of one count of obstruction of justice. The jury acquitted Siegelman on the remaining twenty-two counts. The other two defendants were acquitted on all counts against them.

---

[9]The superseding indictment replaced an earlier version of the indictment.

[10]The federal funds bribery statute criminalizes the taking of a bribe by an official of a state agency that receives over $10,000 in federal funds annually. 18 U.S.C. § 666. Honest services mail fraud criminalizes the mailing of a letter in connection with a scheme to defraud a state agency of an official's honest services in the performance of his official duties. 18 U.S.C. §§ 1341 and 1346.

13

Siegelman and Scrushy were each sentenced to approximately seven years in federal prison.[11]

On appeal, Siegelman and Scrushy together allege nine errors in the trial proceedings below. With respect to the bribery, conspiracy and honest services mail fraud counts against them, defendants assert that the court's instructions erroneously failed to require the jury to find a *quid pro quo* in order to convict; that, in any event, there was insufficient evidence of any *quid pro quo*; that the bribery counts were barred by the statute of limitations; and that the trial court erroneously admitted hearsay used to convict them on these counts. Defendants also allege that there was juror misconduct requiring the grant of a new trial and that the procedures used to select their grand and petit juries violated the Jury Selection and Services Act of 1968 and the Constitution. Siegelman contends that there was insufficient evidence that he obstructed justice and that the district court abused its discretion in sentencing him by upwardly departing from the Sentencing Guidelines. We shall consider each of these allegations of error in turn.

III.

1. *Bribery, Conspiracy and Honest Services Mail Fraud Counts*.

_____

[11]Siegelman and Scrushy were denied bond pending appeal, but a panel of this court subsequently released Siegelman pending resolution of this appeal.

A.     Jury Instructions

The bribery statute under which defendants were convicted makes it a crime for a state official to corruptly agree to accept anything of value from another person "intending to be influenced" in that person's favor in an official action.  18 U.S.C. § 666(a)(1)(B).  The honest services mail fraud statute criminalizes the use of the mails to execute a scheme to defraud another of the right to a public official's honest services.  18 U.S.C. §§ 1341, 1346.  The conspiracy statute prohibits two or more persons from conspiring to commit a federal offense.  18 U.S.C. § 371.

The bribery, conspiracy and honest services mail fraud convictions in this case are based upon the donation Scrushy gave to Siegelman's education lottery campaign.[12]  As such, they impact the First Amendment's core values – protection of free political speech and the right to support issues of great public importance.  It would be a particularly dangerous legal error from a civic point of view to instruct a jury that they may convict a defendant for his exercise of either of these constitutionally protected activities.[13]  In a political system that is based upon

_____

[12]Although the conspiracy and mail fraud counts alleged a broader scheme for Scrushy to self-deal once on the Board, these counts also incorporated the allegations of an agreement between Siegelman and Scrushy to exchange money for the seat on the Board.

[13]Arguably, the potential negative impact of these statutes on issue-advocacy campaigns is even more dangerous than it is to candidate-election campaigns.  Issue-advocacy campaigns

15

raising private contributions for campaigns for public office and for issue referenda, there is ample opportunity for that error to be committed.

The Supreme Court has sought to protect against this possibility by requiring more for conviction than merely proof of a campaign donation followed by an act favorable toward the donor. *McCormick v. United States*, 500 U.S. 257 (1991). In reviewing a Hobbs Act prosecution, the federal crime of extortion under color of official right – demanding a campaign donation in return for taking some favorable official action – the Court said:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as

---

are a fundamental right in a free and democratic society and contributions to them do not financially benefit the individual politician in the same way that a candidate-election campaign contribution does. Defendants assert, and we do not know otherwise, that this is the first case to be based upon issue-advocacy campaign contributions.

they have been from the beginning of the Nation.

*Id.* at 272.

To avoid this result, the Court made clear that only if  "payments are made in return for an *explicit* promise or undertaking by the official to perform or not to perform an official act, are they criminal."  *Id.* at 273 (emphasis added).  The Court quoted the Court of Appeals for the Fifth Circuit, which had said that:

> A moment's reflection should enable one to distinguish, at least in the abstract, a legitimate solicitation from the exaction of a fee for a benefit conferred or an injury withheld.  Whether described familiarly as a payoff or with the Latinate precision of *quid pro quo*, the prohibited exchange is the same: a public official may not demand payment as inducement for the promise to perform (or not to perform) an official act.

*Id.* (quoting *United States v. Dozier*, 672 F.2d 531, 537 (5th Cir. 1982)).

While the Court has not yet considered whether the federal funds bribery, conspiracy or honest services mail fraud statutes require a similar "explicit promise," the Seventh Circuit Court of Appeals has observed that extortion and bribery are but "different sides of the same coin."  *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993).[14]

The district court agreed to instruct the jury that they could not convict the

---

[14]We acknowledge, as the defendants point out, that several district courts, in unpublished opinions, have extended the *McCormick* rationale to the bribery and honest service statutes.  The government points to no contrary authority, relying instead on inapposite authority not involving campaign contributions.

defendants of bribery in this case unless "the defendant and the official *agree* that the official will take specific action in exchange for the thing of value." (emphasis added). This instruction was fashioned by the court in direct response to defendants' request for a *quid pro quo* instruction, and was given in addition to the Eleventh Circuit's pattern jury instruction for federal funds bribery cases. So, whether or not a quid pro quo instruction was legally required, such an instruction was given.

Defendants, however, assert that the instruction was inadequate under *McCormick.* Defendants assert that the instruction failed to tell the jury that not only must they find that Siegelman and Scrushy agreed to a *quid pro quo*, the CON Board seat for the donation, but that this agreement had to be *express.* We disagree that *McCormick* requires such an instruction.

*McCormick* does use the word "explicit" when describing the sort of agreement that is required to convict a defendant for extorting campaign contributions. It does not, however, mean *express*. Defendants argue that only "proof of actual conversations by defendants," will do, suggesting in their brief that only *express* words of promise overheard by third parties or by means of electronic surveillance will do.

But *McCormick* does not impose such a stringent standard. One year after

18

*McCormick*, the Supreme Court approved the following jury instruction:

> However, if a public official demands or accepts money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the [federal extortion statute] regardless of whether the payment is made in the form of a campaign contribution.

*Evans v. United States*, 504 U.S. 255, 258 (1992). The Court held that the instruction "satisfies the *quid pro quo* requirement of *McCormick v. United States*." *Id.* at 268. The Court said that the "Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.*

The instruction approved in *Evans* required that the acceptance of the campaign donation be in return for a *specific* official action – a *quid pro quo*.[15] No generalized expectation of some future favorable action will do. The official must agree to take or forego some specific action in order for the doing of it to be criminal under Section 666. In the absence of such an agreement on a specific action, even a close-in-time relationship between the donation and the act will not suffice.

But there is no requirement that this agreement be memorialized in a

---

[15]The Latin means "something for something," Black's Law Dictionary 1282 (8th ed. 2004).

19

writing, or even, as defendants suggest, be overheard by a third party. Since the agreement is for some specific action or inaction, the agreement must be *explicit*, but there is no requirement that it be *express*. To hold otherwise, as Justice Kennedy noted in *Evans*, would allow defendants to escape criminal liability through "knowing winks and nods." 504 U.S. at 274 (Kennedy, J. concurring). *See also United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994) ("*Evans* instructed that by 'explicit' *McCormick* did not mean express"); *United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 2001); *United States v. Tucker*, 133 F.3d 1208, 1215 (9th Cir. 1998); *United States v. Hairston*, 46 F. 3d 361, 365 (4th Cir. 1995).[16]

Furthermore, an explicit agreement may be "implied from [the official's] words and actions." *Evans*, 504 U.S. at 274 (Kennedy, J., concurring). As Justice Kennedy explained:

> The criminal law in the usual course concerns itself with motives and consequences, not formalities. And the [jury] is quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor.

---

[16]Nor is this court's prior holding in *United States v. Davis*, 30 F.3d 108 (11th Cir. 1994), to the contrary. In *Davis*, we acknowledged that, after *McCormick*, "an explicit promise by a public official to act or not act is an essential element of Hobbs Act extortion, and the defendant is entitled to a reasonably clear jury instruction to that effect." *Id.* at 108. We reversed Davis' conviction not only because his jury did not receive a reasonably clear instruction, but because the court in that case "informed the jury that 'a specific *quid pro quo* is not always necessary for a public official to be guilty of extortion.'" *Id.*

20

*Id.  See also United States v. Massey*, 89 F.3d 1433, 1439 (11th Cir. 1996) (holding that bribery conviction under general federal bribery statute, 18 U.S.C. § 201, may be supported by "inferences drawn from relevant and competent circumstantial evidence").

In this case, the jury was instructed that they could not convict the defendants of bribery unless "the Defendant and official *agree* that the official will take *specific* action in *exchange* for the thing of value."  This instruction required the jury to find an agreement to exchange a specific official action for a campaign contribution.  Finding these facts would satisfy *McCormick's* requirement for an explicit agreement involving a *quid pro quo*.  Therefore, *assuming* a *quid pro quo* instruction was required in this case, we find no reversible error.[17]

B.    Evidence on the Bribery, Conspiracy and Honest Services Mail Fraud
       Convictions

1.    <u>The Bribery, Conspiracy and Related Mail Fraud Counts</u>[18]

Defendants argue that the sole evidence of any explicit *quid pro quo* in

---

[17]Because the conduct charged in the conspiracy and honest services mail fraud counts incorporates the conduct alleged in the federal funds bribery counts, on which the jury was instructed to find a *quid pro quo*, any failure to adequately instruct the jury on a *quid pro quo* requirement for the conspiracy and honest services counts was harmless.  *See Cupp v. Naughten*, 414 U.S. 141, 148-48 (1973) (jury instructions must be evaluated as a whole).

[18]Counts 6 and 7 charge Mail Fraud in connection with the mailings of the letters appointing (Count 6) and reappointing (Count 7) Thom Carman as Scrushy's replacement on the CON Board in connection with the bribery scheme.

21

connection with Siegelman's appointment of Scrushy to the CON Board was Bailey's testimony regarding the conversation he had with Siegelman following the meeting at which Scrushy delivered the first $250,000 check to Siegelman, and that this evidence was legally insufficient to support the jury's finding of a *quid pro quo*. We disagree.

Bailey testified that after the meeting, Siegelman showed him the check, said that it was from Scrushy and that Scrushy was "halfway there." Bailey asked "what in the world is he going to want for that?" Siegelman replied, "the CON Board." Bailey then asked, "I wouldn't think that would be a problem, would it?" Siegelman responded, "I wouldn't think so."

Defendants assert that this conversation shows that there was *not* an explicit or express agreement at this time between Siegelman and Scrushy. They argue that the conversation on its face indicates that, at best, there was only some vague expectation about the future. Defendants assert that Bailey's testimony shows at most that:

> Governor Siegelman knew, or at least thought, that Scrushy wanted a C.O.N. Board appointment in recognition of the contribution – and that Governor Siegelman didn't think that making such an appointment would present a problem.

According to defendants, even if the conversation between Bailey and Siegelman took place exactly as Bailey recounts, "no one can 'infer' from the

22

alleged conversation recounted by Bailey that a true explicit promise or agreement had happened behind closed doors."

What is missing in this record, according to defendants, is any evidence of a discussion between Governor Siegelman and Scrushy to the effect of "I will make this contribution, and in exchange for this contribution you will appoint me. Are we agreed on that?" "Yes we are."[19] In the absence of such evidence, according to the defendants, no reasonable juror could infer an explicit agreement between Siegelman and Scrushy.

We disagree. Inferring actors' states of mind from the circumstances surrounding their conversation, from their actions, and from their words spoken at the time is precisely the province of the jury. As we noted above, "the [jury] is quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor." *See Evans*, 504 U.S. at 274 (Kennedy, J., concurring). In making these judgments, jurors are presumed to use their common sense and are free to choose among reasonable constructions of the evidence. *See United States v. Mosquera*, 779 F.2d 628, 630 (11th Cir. 1986). Bailey's testimony was competent evidence

---

[19]This suggestion as to the evidence that would be sufficient is asserted in Siegelman's brief.

that Siegelman and Scrushy had agreed to a deal in which Scrushy's donation would be rewarded with a seat on the CON Board. The jurors were free to give it a different construction, but they did not.

Furthermore, this was not the sole evidence that Scrushy bribed Siegelman. The jury was entitled to construe this conversation in the context of the substantial additional testimony they had heard regarding Scrushy's donation to the lottery campaign fund.

For example, Bailey repeatedly testified, without qualification, that Siegelman and Scrushy had an explicit agreement to exchange money for a seat on the CON Board.[20] Bailey also testified that Siegelman met with Eric Hanson, an outside lobbyist for HealthSouth, and told him that because Scrushy had contributed at least $350,000 to Siegelman's opponent in the general election that Scrushy needed to "do" at least $500,000 in order to "make it right" with the Siegelman campaign. Bailey testified that Siegelman was referring to the campaign for the lottery initiative, and that Hanson was to relay this conversation to Scrushy. Bailey also testified that, in another conversation, Hanson told Bailey that Scrushy wanted control of the CON Board.

---

[20]Defense counsel also recognized this fact. Scrushy's counsel said to Bailey on cross-examination, "I'm talking about your testimony that there was some exchange of official action for the payments that Mr. Scrushy gave, all right."

Martin corroborated Bailey's testimony when he stated that "[h]e [Scrushy] told me that if we raised that money, then we would have a spot on the CON Board," and "We were making a contribution . . . in exchange for a spot on the CON Board." Martin also testified that Hanson bragged about getting HealthSouth a seat on the CON Board with the help of the IHS check.

Cline testified that Siegelman told him that Scrushy was responsible for the first $250,000 check and that "there was another $250,000 that would be coming." Cline also testified that the receipt of the checks by the Foundation was not reported until after newspaper articles questioning the Foundation's finances.[21]

McGahan's testimony regarding Scrushy's solicitation of him to make the donation also supported an inference that the donation was illicit. Loretta Skeleton, HealthSouth's lawyer, testified that, although she was responsible for HealthSouth political contributions, she was told nothing about the $500,000 donations.

Finally, the close relationship in time between the first check and Siegelman's appointment of Scrushy was also some evidence of *quid pro quo*.

In sum, the evidence was sufficient such that a reasonable juror could have

---

[21]There was testimony that all other contributions to the Foundation were similarly not reported, but the jury was free to choose the reasonable inference that the failure to report the licit contributions was to conceal the illicit ones.

concluded that Siegelman and Scrushy explicitly agreed to a corrupt *quid pro quo*, thereby proving the bribery, conspiracy and the two related mail fraud counts (Counts 6 and 7).

### 2. The Honest Services Mail Fraud Counts 8 and 9

Siegelman separately challenges his mail fraud convictions on Counts 8 and 9 of the indictment, each of which charged that he caused a mailing that helped to execute a scheme between himself and Scrushy to deprive the State of Alabama of its right to their honest services as the Governor and as a member of the CON Board.  Counts 8 and 9 alleged that the scheme included not only the exchange of the seat on the CON Board for the $500,000 lottery campaign, but also that Scrushy "would and did use his seat on the CON Board to attempt to affect the interests of HealthSouth and its competitors," and that Scrushy "would and did offer things of value to another Board member to attempt to affect the interests of HealthSouth and its competitors."  Although Scrushy was not on the Board when the alleged self-dealing occurred, the indictment charged that it was part of the scheme that Siegelman and Scrushy "orchestrated Scrushy's replacement on the Board by another person employed by HealthSouth."  The mailings charged in connection with these allegations were letters sent by the Board to HealthSouth, notifying it that it had been awarded Certificates of Need in connection with the

26

rehabilitation hospital (Count 8) and the PET scanner (Count 9). Siegelman claims that the evidence at trial was insufficient to support his knowing participation in this alleged scheme.[22]

The evidence at trial was that Scrushy resigned from his seat on the Board in January of 2001 and that, the next day, Siegelman appointed Thom Carman, HealthSouth vice-president, to the remainder of the term. When Scrushy's term expired in July, Siegelman reappointed Carman.

While on the Board, Carman employed another member of the Board, Tim Adams, to prepare the application for the PET scanner, paying him $8000 to do so.[23] There was also testimony that Adams was paid another $3000 for "additional work he apparently had done on the PET scanner application" in return for his agreement to attend the CON Board meeting at which HealthSouth's application for a rehabilitation hospital in Phenix City was considered. At the meeting, Carman recused himself from voting on the application. Adams attended, and although he abstained from voting, under the Board's rules, his abstention did not affect the quorum his presence established, thus permitting a vote to be taken. There was no opposition to the application and the Board unanimously approved

---

[22]Scrushy does not make this argument.

[23]There was testimony that Adams had never written a CON Board application, and that his work was substandard.

the application.

Six months later, the PET scanner application was also approved. At this meeting, Adams' presence was not necessary to the quorum. Carman recused himself, and Adams abstained from voting. The application was unopposed and passed unanimously.

Alva Lambert, the Executive Director of the Board, testified that unopposed applications were routinely approved, and that both these applications were consistent with prior Board actions. There was no evidence that Siegelman knew of Carman's actions in hiring Adams to prepare the application. There was no evidence that he knew of any of these Board actions.

Siegelman challenges the sufficiency of this evidence to establish that he caused the Board letters to be mailed to HealthSouth, informing it of the award of Certificates of Need in connection with the PET scanner or the rehabilitation hospital. Since there was no evidence that Siegelman participated in the events forming the basis for the charges in Counts 8 and 9, nor even that he had any knowledge of these events, Siegelman argues he cannot be held liable for this conduct on a theory of *respondeat superior* or vicarious liability. In view of our holding that the jury's finding of an explicit agreement between Siegelman and Scrushy to exchange money for a seat on the CON Board is supported by the

28

evidence, we shall address whether the law permits Siegelman to be held liable for Scrushy's subsequent conduct on the Board.

It is the law of this circuit, as well as others, that all who with criminal intent join themselves to the principal scheme may be guilty of a violation of the mail fraud statute. *United States v. Toney*, 598 F.2d 1349, 1355 (5th Cir. 1979). *See also United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) ("Like co-conspirators, 'knowing participants in the scheme are legally liable' for their co-schemers use of the mails or wires"); *United States v. Leahy*, 445 F.3d 634, 656 (3d Cir. 2006); *United States v. Stull*, 743 F.2d 439 (6th Cir. 1984); *United States v. Sedovic*, 679 F.2d 1233 (8th Cir. 1982); *United States v. Read*, 658 F.2d 1225 (7th Cir. 1981). Each person who is knowingly a party to the principal scheme is liable for the acts of other schemers in pursuance of that scheme. *Toney*, 598 F.2d at 1355.

Recently, in *United States v. Ward*, 486 F.3d 1212 (11th Cir. 2007), we reiterated this long-standing principle that, if one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails:

> For nearly as long as mail fraud has been a federal crime, it has been the law in this Circuit, and in the former Fifth Circuit, that a defendant may be convicted of mail fraud without personally committing each and every element of mail fraud, so long as the

29

defendant knowingly and willfully joined the criminal scheme, and a co-schemer used the mails for the purpose of executing the scheme.

*Id.* at 1222.

It may be assumed, then, that Siegelman did not sign or cause to be mailed either of the letters set out in Counts 8 and 9, or even that he participated in the events generating those letters. He may, nevertheless, be held criminally liable for Scrushy's conduct on the Board if he was a knowing party to a scheme that included that conduct.

The question regarding these counts is whether the criminal scheme charged in the indictment was broader than the initial pay-to-play agreement between Siegelman and Scrushy, but also included agreement on the broader objective of permitting or promoting Scrushy's self-dealing while on the Board. If so, it is immaterial that Siegelman may not have known about each particular success in that scheme or caused to be mailed the CON Board letters that furthered that scheme. "A partnership in crime being established against both appellants, the acts of [Scrushy] in furtherance of the common criminal enterprise were in law the acts of [Siegelman] also." *See Belt v. United States*, 73 F.2d 888, 889 (5th Cir. 1934).

Just as in *Ward*, where the defendant denied knowledge of both the mailing and the circumstances prompting it, Siegelman's lack of involvement in causing a

30

specific mailing and the circumstances prompting it are immaterial so long as there is sufficient evidence to show that he was a knowing participant in the broader fraudulent scheme, which involved the use of the mails. *See Ward*, 486 F.3d at 1223 (citing *United State v. Bright*, 588 F.2d 504 (5th Cir. 1979)).

Counts 8 and 9 charge a scheme broader than the initial pay-for-play agreement. These counts alleged that Siegelman and Scrushy agreed not only to exchange money for a seat on the Board, but also that Scrushy "would and did use his seat on the CON Board to attempt to affect the interests of HealthSouth and its competitors," and that Scrushy "would and did offer things of value to another Board member to attempt to affect the interests of HealthSouth and its competitors." The government argues in its brief that not only did Siegelman know that Scrushy wanted the seat in order to self-deal on the CON Board, but that "it was certainly foreseeable to Siegelman that Scrushy would bribe another Board member to further HealthSouth's interests" since "[a]fter all, Scrushy paid Siegelman $500,000 to get HealthSouth a seat on the Board in the first place." Thus, the indictment charges a broader scheme that would subject Siegelman to criminal liability for Scrushy's actions on the Board so long as Siegelman was a knowing participant in that broader scheme.

The final question, then, is whether the government proved that scheme. In

31

order to uphold Siegelman's convictions on Counts 8 and 9, the evidence must have been sufficient for the jury to conclude both that Siegelman knew that Scrushy intended to defraud Alabama of his honest services while on the Board and that Siegelman personally intended to participate in this fraud. We hold that it was not.

The testimony in support of the government's allegation of a pay-to-play scheme whereby Scrushy paid Siegelman for a seat on the CON Board came principally from Bailey, Martin, Young, McGahan, and Skelton. Of these witnesses, only Skeleton, HealthSouth's lawyer in charge of certificates of need, had any knowledge about Scrushy's subsequent alleged self-dealing while on the CON Board. Her testimony, however, did not mention Siegelman. Alva Lambert, the Executive Director of the CON Board during the relevant time and the other primary government witness in support of the allegations of Scrushy self-dealing, testified that the Siegelman CON Board was an "extremely well-balanced" Board, that CON Boards had never to his knowledge turned down an application for a PET scanner, and that he never saw Siegelman exert any influence or try to exert any influence whatsoever over a Board decision.

Neither in its brief nor at oral argument did the government point to *any* testimony in support of its allegation that Siegelman and Scrushy agreed to a

broader scheme in which Scrushy would self-deal on the Board. Nor has our independent and careful review of record revealed any.

Rather, the government's brief argues that Siegelman's knowing participation in the broader self-dealing scheme may be inferred from three facts proven at trial: first, that Siegelman and Scrushy agreed to exchange the CON Board seat for money; second, that the amended Foundation financial statements that disclosed the Scrushy donations, which were filed around the time of the mailings, did not list Scrushy as the ultimate source of the IHS check; and third, that Siegelman was still governor when the Pet scanner and Phenix City projects were approved and could have removed Scrushy or Carman from the Board at any time. The first two of these facts relate primarily to the initial pay-to-play scheme, and the final fact is not sufficient to show participation in a broader scheme, much less knowing participation. None is remotely sufficient to permit a jury to infer that Siegelman agreed to a broader self-dealing scheme.

In view of this absolute lack of any evidence whatsoever from which the jury could infer that Siegelman knowingly agreed to or participated in a broader scheme that included Scrushy's alleged subsequent self-dealing while on the Board, we shall reverse Siegelman's convictions on these counts.

2. *Bribery Counts and the Statute of Limitations*

Defendants claim that their bribery convictions are time-barred because the statute of limitations began to run no later than the date of Siegelman's receipt of the IHS check or Scrushy's appointment and the indictment was returned more than five years after that. They did not, however, raise this argument before the district court, either in a pretrial motion or at trial. It is, therefore, waived.

Defendants do not dispute that they first raised this limitations claim in motions for judgment of acquittal under Fed. R. Crim. P. 29(c), over one month after the jury rendered its verdict. We have previously rejected such attempts to challenge the sufficiency of the indictment after the trial. *United States v. Ramirez*, 324 F.3d 1225 (11th Cir. 2003). In *Ramirez*, we rejected a limitations defense raised by way of a post-trial Rule 29 motion. *Id.* We held that "when a statute of limitations defense is clear on the face of the indictment and requires no further development of facts at trial, a defendant waives his right to raise that defense by failing to raise it in a pretrial motion." *Id.* at 1228-29.

Even where the facts are at issue regarding the limitations period, this court and its predecessor have long held that "the statute of limitations is a matter of defense that must be asserted at trial by the defendant" and that failure to do so results in a waiver. *United States v. Najjar*, 283 F.3d 1306, 1308 (11th Cir. 2002); *accord Capone v. Aderhold*, 65 F.2d 130, 131 (5th Cir. 1933). Other circuits agree.

34

*See, e.g., United States v. Gallup*, 812 F.2d 1271 (10th Cir. 1987); *United States v. Karlin*, 785 F.2d 90, 92-93 (3d Cir. 1986).

Requiring the defendant to assert a limitations defense at trial gives the prosecution a fair opportunity to rebut the defense through additional evidence or during summation. *See United States v. Arky*, 938 F.2d 579, 582 (5th Cir. 1991); *United States v. Oliva*, 46 F.3d 320, 324-25 (3d Cir. 1995). Furthermore, the "determination of when the crime has been committed for statute of limitations purposes . . . is ordinarily a question of fact for the jury." *Oliva*, 46 F.3d at 324-35.

Allowing a defendant to raise a limitations defense for the first time in a post-verdict Rule 29 motion "is inconsistent with the characterization of the statute of limitations as an affirmative defense and would unfairly sandbag the government." *United States v. Thurston*, 358 F.3d 51, 63 (1st Cir. 2004), *vacated on other grounds*, 543 U.S. 1097 (2005).

The defendants apparently made a strategic decision not to present a statute of limitations defense at trial. Such a defense would have required them to make an argument to the jury that assumed their guilt on the bribery charges. While defendants are free to make the strategic decision not to do so, they may not later be heard to complain when the claim is held to have been waived.

35

3.    *Sufficiency of the Evidence of Obstruction of Justice*

Siegelman was charged with two counts of obstruction of justice.[24]  The indictment alleged and the government undertook to prove that eighteen months after the $9200 pay-to-play payment to Siegelman from Lanny Young, Siegelman and Bailey became aware of the federal-state corruption investigation and instigated a series of sham check transactions in an effort to coverup the payment. The coverup was designed to make it appear that Bailey had borrowed the $9200 from Young so that he could buy a motorcycle from Siegelman.

Count 16 alleged that Siegelman corruptly persuaded Bailey to write a check for $10,503 to Young with the notation "repayment of loan plus interest." Count 17 alleged that Siegelman corruptly persuaded Bailey to write and give him a check for $2973.35 with the notation on it that it was the "balance due on m/c." Count 17 also alleged that Siegelman engaged in misleading Bailey's attorney with the intent to hinder or prevent the attorney's communication of information

---

[24]Section 1512(b)(3) provides in pertinent part:

Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to –
. . .
(3)    hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . .

36

regarding these transactions to the FBI.

The jury acquitted Siegelman of Count 16, but convicted him on Count 17. Siegelman contends that the evidence was insufficient to show that he persuaded Bailey to write the check charged in Count 17 or that he misled Bailey's attorney. We turn now to the evidence.

At trial, Young testified that in January of 2000, Siegelman asked him for $9200 to buy a motorcycle and that he gave it to Siegelman as part of the pay-to-play, on-going agreement he had with Siegelman. He also testified that, eighteen months later, after the federal-state corruption investigation began, he and Bailey had the following conversation:

> Young:     Right after the investigation started, Nick [Bailey] called me and asked me if I could recall how I made out the check for the motorcycle. And I said – on what account I had written the check for the motorcycle. And I said no, why? He said because if it's on one of your personal accounts, you are going to have a motorcycle in your driveway tonight.

Bailey testified that the coverup began when:

> Bailey:     I found out about the investigation that was going on with Lanny – could have involved others; we weren't sure at the time. I wanted to repay Lanny's $9200. I did it in the form of a check. Did a promissory note with Lanny to repay this $9200 plus interest, $10,503.

Bailey gave the following testimony regarding Siegelman's involvement in

37

this first step in the coverup:

Government:      When you went to write this check to Lanny
                 [Young] to disguise this earlier transaction, did
                 you do that with the knowledge of the Governor?
Bailey:          Yes.
Government:      Did you talk to him about it before you did it?
Bailey:          Yes.
Government:      Was he in agreement with you doing that?
Bailey:          Yes.
Government:      When you talked to him about why you were going to do
                 that, did you guys talk about the fact that this criminal
                 investigation was going on?
Bailey:          Yes.
Government:      What were you and the Governor trying to accomplish
                 when you wrote that check back to Lanny Young 17
                 months after that check had been written for $9200 to the
                 Governor?
Bailey:          To disguise the $9200 that went from Lanny to me to the
                 Governor.

Young's testimony regarding the purported repayment was:

Government:      Had you loaned Nick Bailey any money that would cause
                 him to give you that $10,503 check?
Young:           No.
Government:      Well, what was going on when he wrote you that check,
                 if you know?
Young:           He was trying to make the $9200 look like a loan.

Bailey testified that the final step in the coverup was to give Siegelman a

$2,793.35 check with the notation on it that it was "balance due on m/c" to make it

appear that the check was Bailey's final payment for the motorcycle.  His

testimony about Siegelman's involvement in this step of the coverup was:

38

| | |
|---|---|
| Government: | What was going on here? |
| Bailey: | We made a decision to finalize the agreement we made regarding the motorcycle early on, and this was to finish that. We met at the Governor's attorney's office and with my attorney, and that's when I finished paying the Governor in full for the motorcycle to carry out the plan that we had entered into probably 12 to 18 months earlier. |
| Government: | And what was that plan? |
| Bailey: | To disguise the $9200 from Lanny to the Governor. |

Finally, Bailey testified regarding his interview with the FBI regarding this meeting:

| | |
|---|---|
| Government: | Now, not long after [he gave the check to Siegelman] you had an occasion to be interviewed by federal and state criminal investigators, didn't you. |
| Bailey: | Yes, sir. |
| Government: | When they questioned you about this transaction on that occasion, did you tell them the truth about what had happened? |
| Bailey: | No. |
| Government: | Why not? |
| Bailey: | There were a number of reasons; but primarily, I was still trying to protect myself and my boss. |

The jury considered all of this testimony and found Siegelman guilty of the obstruction of justice charged in Count 17, but not in Count 16. This means that the jury decided, as a matter of fact, that Siegelman persuaded Bailey to write the check for $2973.35, but not the initial check for $10,500.

In evaluating the sufficiency of the evidence to support the jury's verdict,

39

we are required to "view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict." *United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007). The evidence needs not "be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

A reasonable juror could have concluded that Siegelman persuaded Bailey (he asked and Bailey agreed) to take the final step in the cover up by giving him a $2793.35 check with the notation that it was final payment for the motorcycle. *See United States v. Tocco*, 135 F.3d 116, 126-27 (2d Cir. 1998) (affirming jury inference of persuasion from defendant's strong influence over witness who was employee); *United States v. Morrison*, 98 F.3d 619, 629-30 (D.C. Cir. 1996) (making a request sufficient persuasion). The testimony was that Siegelman knew and agreed that Bailey would disguise Young's payment to Siegelman as a loan to Bailey to buy the motorcycle by "paying back" Young with his own check. The evidence further showed that Siegelman accepted and cashed the $2973.35 check from Bailey with the notation that it was final payment for the motorcycle. Finally, the jury had heard testimony that Bailey always did what Siegelman asked

him to do.

The jury's acquittal on Count 16 shows that it was not convinced beyond a reasonable doubt that Siegelman instigated the coverup by directing Bailey to "pay back" Young with the initial $10,500 check. But by the time Bailey wrote the check to Siegelman for $2793.35, just over four months later, as a final step in the coverup, the jury's conviction on Count 17 indicates that it concluded Siegelman not only knew what Bailey was doing to coverup Young's corrupt payment, but that he was directing the coverup by persuading Bailey to write the check to him.

This sort of split verdict is itself evidence that the jury considered the charges carefully and individually, addressed the strength of the evidence on each charge, and reached a reasoned conclusion. *See United States v. Dominguez*, 226 F.3d 1235, 1248 (11th Cir. 2000) (making these comments in the context of allegations of premature jury deliberations).

Siegelman's argument against the sufficiency of this evidence mirrors that he made against his convictions on virtually all the other counts – that the evidence in this case was not perfect, that it relied too heavily on circumstances and required the jury to draw inferences from those circumstances that might have been drawn differently by different jurors.

But this is far too academic a view of trial by jury. In the absence of a

defendant's confession or observation of his wrongdoing by a third person, proof by circumstantial evidence and the fair inferences to be drawn therefrom is both necessary and permissible. Siegelman's contention throughout his brief that "there was no evidence" to support a particular inference too often meant merely that there was no evidence other than Bailey or Young's testimony. While Siegelman may not approve that the testimony of coconspirators was sufficient to support the jury's findings of fact, the jury was free to disregard or disbelieve it. They believed it.

With respect to the "misleading" prong of the statute, the evidence was more than sufficient to support the jury's finding that the delivery of the final check in the presence of the two lawyers and the use of the lawyers to "finalize" the sale of the motorcycle to Bailey was an attempt to "create witnesses as part of a cover-up and to use unwitting third parties or entities to deflect the efforts of law enforcement agents in discovering the truth," *United States v. Veal*, 153 F.3d 1233, 1247 (11th Cir. 1998) (statute satisfied by "the *possibility* or *likelihood* that [the defendants'] false and misleading information would be transferred to federal authorities. . ."). The jury was entitled to infer from the sham check transaction in Bailey's lawyer's presence that Siegelman intended to mislead the lawyer into believing that the transaction was legitimate, that Bailey had, indeed, purchased

the motorcycle from him, and that the check was final payment. As the "unwitting third party," the lawyer would be in a position factually to support the cover up since Siegelman clearly knew that there was a "possibility" that the federal investigators would come asking.[25]

4.    *Admission of a Co-conspirator's Statement*

Defendants challenge the admission of Hanson's out-of-court statement to Martin at a HealthSouth retreat in the fall of 1999. Martin testified that Hanson "was bragging about the fact that he was able to get [HealthSouth] a spot on the CON Board with the help of the [IHS] check."

Under Fed. R. Evid. 801(d)(2)(E), a court has the discretion to admit coconspirator statements made during and in furtherance of the conspiracy. The court's admission of such statements is an abuse of its discretion to do so if the statements do not meet this legal standard. *United States v. Magluta*, 418 F.3d 1166 (11th Cir. 2005).

This court applies a liberal standard in determining whether a statement was in furtherance of a conspiracy. *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988). "The statement need not be necessary to the conspiracy, but must

---

[25]Indeed, the "bill of sale" for the motorcycle, prepared by the attorneys, was introduced at this trial. Similarly, Bailey had also delivered the "loan re-payment" check for $10,503.39 to Young in the office of Young's lawyer.

only further the interests of the conspiracy in some way." *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002). "[I]f the statement 'could have been intended to affect future dealings between the parties,' then the statement is in furtherance of a conspiracy." *United States v. Caraza*, 843 F.2d 432, 436 (11th Cir. 1988) (quoting *United States v. Patton*, 594 F.2d 444, 447 (5th Cir. 1979)). Finally, "[s]tatements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy . . . ." *United States v. Ammar*, 714 F.2d 238, 252 (3d Cir. 1983). Even defendants concede that boasting or bragging is in furtherance of a conspiracy if the statements are directed at obtaining the confidence or allaying the suspicions of coconspirators. *Santiago*, 837 F.2d at 1549.

Hanson's statement at the HealthSouth retreat furthered the conspiracy. We agree with the government that, given Martin's own involvement in the conspiracy (obtaining the IHS check), Hanson's bragging to him about purchasing the CON Board seat "with the help of" the IHS check informed Martin that their plan had worked and that Martin's involvement had helped. This alone is sufficient to permit its introduction under *Ammar*, 714 F.2d at 252. Additionally, however, the statement is easily seen to affect the coconspirators future dealings because

44

Martin's assistance might be needed in connection with the second $250,000 donation and Hanson knew this. Thus, Hanson's statement easily meets the *Caraza* standard. 843 F.2d at 436 (approving statement admitted after several acts of conspiracy helping to ensure final acts). The district court did not abuse its discretion in admitting this evidence.

5.      *Juror Misconduct*

Defendants filed a joint motion for a new trial under Fed. R. Crim. P. 33(a), alleging juror misconduct by way of both juror exposure to extraneous information as well as by improper juror deliberation and that each impropriety violated the Sixth Amendment and requires a new trial.[26] After conducting two evidentiary hearings on this issue,[27] the district court held that no substantial violation of the Sixth Amendment occurred that required a new trial. We review the denial of a motion for new trial based on alleged juror misconduct for an abuse of discretion. *United States v. Venske*, 296 F.3d 1284, 1290 (11th Cir. 2002).[28] We will consider each of the claims of misconduct in turn.

_____

[26]Scrushy has moved this court to appoint a special master under Fed. R. App. R. 48 to investigate the matter. The request is denied.

[27]In the first of these hearing, the court considered the affidavit of Juror 5 to determine whether it established sufficient reason to conduct further inquiry, concluding that it did.

[28]Of course, the district court's findings of facts supporting its legal conclusion are reviewed only for clear error. *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990).

A.     Juror Exposure to Extraneous Information

The Sixth Amendment to the United States Constitution guarantees the right to trial by an impartial jury. U.S. Const. amend. VI. To protect the right to an impartial jury, the Supreme Court has recognized that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The jury must determine guilt solely on the basis of the evidence presented at trial and the court's instructions as to the applicable law. *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965).

We presume, however, that the jury has been impartial. *United States v. Winkle*, 587 F.2d 705, 714 (5th Cir. 1979).[29] A defendant who alleges denial of this right resulting from juror exposure to extraneous information has the burden of making a colorable showing that the exposure has, in fact, occurred. *Id. See also United States v. Ayarza-Garcia*, 819 F.2d 1043, 1051 (11th Cir. 1987). If the defendant does so, prejudice to the defendant is presumed and the burden shifts to the government to show "that the jurors' consideration of extrinsic evidence was

_____

[29]All decisions of the Fifth Circuit prior to October 1, 1981, when this court was established, have been adopted as decisions of this court. *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

46

harmless to the defendant." *Remmer v. United States*, 347 U.S. 227 (1954);

*United States v. Ronda*, 455 F.3d 1273, 1299 (11ᵗʰ Cir. 2006).[30]

If the district court concludes the exposure to the extrinsic evidence was harmless to the defendant, on appeal, we review this conclusion for an abuse of discretion. *Id.* at 1296 n.33. In doing so, we look at all the circumstances and we consider: (1) the nature of the extrinsic evidence; (2) the manner in which it reached the jury; (3) the factual findings in the district court and the manner of the court's inquiry into the juror issues; and, (4) the strength of the government's case. *Id.* at 1299-1300.

Defendants attached several exhibits to their motion regarding juror misconduct, including news articles after the trial and copies of affidavits by Juror 5 and his wife and his wife's pastor. This material, especially the affidavits of Juror 5, suggested that, during the trial, some of the jurors may have seen information about the trial on the internet.

Finding that the defendants had made a colorable showing of extrinsic influence on the jury, the district court held a hearing to which all twelve jurors were summoned and told to bring with them any material related to outside

[30]*Ronda* recognized that there has been some inconsistency in our application of *Remmer*, but, as in *Ronda*, we decline to consider this issue because it has no bearing on the outcome. 455 F.3d at 1299 n.36.

information that they or any other juror considered during trial or deliberations. At the hearing, the court asked each juror a series of twelve questions designed to reveal the nature and extent of any extrinsic evidence to which the jurors were exposed.[31] Each juror testified under oath in response to the twelve questions and follow-up questions.

Based upon this testimony, the district court found that there was credible evidence establishing that during deliberations some of the jurors were exposed to the following extrinsic evidence: (1) a copy of the Second Superseding Indictment obtained from the district court's own website; and (2) juror information from the website concerning the foreperson's obligation to preside over the jury's deliberations and to give every juror a fair opportunity to express his views.

### 1. Exposure to a Book About the Role of the Foreperson

As a matter of fact, and based upon the testimony given by the jurors in the hearing, the district court found that the extrinsic evidence accessed from the district court's own website by Juror 7 and mentioned by him in jury deliberations did not pertain to any substantive issue in defendants' trial. It concerned only the process of deliberation. Furthermore, it did not contradict any instruction given by the court, was consulted and discussed for only a few moments of a more than

---

[31]These questions are attached as Exhibit "A" to this opinion.

five-day deliberation. It was discussed to encourage full participation by all the jurors. The district court concluded that the exposure of the jury to this extrinsic information was harmless to the defendants.

We agree. In substantially similar circumstances, we affirmed a district court's decision that a new trial was not required in a case where the jury foreman went to the library and checked out a book entitled *What You Need to Know for Jury Duty*, and then exposed the jury to it. *United States v. De La Vega*, 913 F.2d 861, 869 (11th Cir. 1990). In that case, the foreperson read the book, implemented suggestions for jury procedures outlined in the book, brought the book to the jury room, and showed some other jurors a page in the book that outlined organizational steps for deliberation. *Id.* at 869-70. We held that the district court did not abuse its discretion in concluding that there was no reasonable possibility that the introduction of this extrinsic information prejudiced the defendants such that a new trial was required. *Id.* at 870-71.

The district court did not abuse its discretion in concluding that the introduction of similar information in this case was harmless beyond a reasonable doubt. The district court carefully investigated this matter. Its factual findings that this information was unrelated to the charges or any evidentiary matter in the case, and that it was introduced by a juror, not an outside influence, are not clearly

49

erroneous. Furthermore, the district court held, and we agree, that the government's case was strong on the counts of conviction. In view of these findings, we conclude that the district court did not abuse its discretion in holding that there was no reasonable possibility of prejudice to the defendants arising out of the exposure of the jury to this extrinsic evidence and denying the motion for a new trial.

### 2. Exposure to the Unredacted Second Superseding Indictment

During trial, the district court granted the government's motion to cure what the court had determined was mutiplicitous charging of the federal funds bribery counts by removing reference to Siegelman in Count 4 and to Scrushy in Count 3 of the Second Superseding Indictment.[32] The district court provided the jury with a copy of the resulting redacted Second Superseding Indictment for its deliberations.

Based upon its questioning of the jurors, the district court found that Juror 7 and Juror 40 accessed a copy of the unredacted Second Superseding Indictment early during the jury's deliberations. They each obtained the indictment from the court's website in order to be able to review the allegations outside of the jury

[32]The government had charged both in each count, thereby permitting each to be convicted twice for the same offense.

50

deliberation room. Additionally, some other members of the jury became aware that Jurors 7 and 40 had spent time outside of the jury room reviewing the content of this document. While the jury did not discuss this fact at length, it did discuss it. There was no evidence, however, that any members of the jury other than Jurors 7 and 40 actually read the unredacted Second Superseding Indictment, or that either Juror 7 or Juror 40 ever realized that there was any difference between the two indictments.

The district court found that the two jurors had been exposed to the unredacted indictment, which was extrinsic information, and that other jurors had been exposed to the fact that those jurors had obtained a copy of the document from the internet. Considering the totality of the circumstances, including the substantial evidence of defendants' guilt on the counts of conviction, the district court concluded that the jury's exposure to this extrinsic information was harmless beyond a reasonable doubt and it denied them a new trial.

We agree. This extrinsic evidence was the charging document itself. The district court specifically found that, prior to the redaction, the jurors had been repeatedly exposed to comment by the court and all the parties on the contents of the Second Superseding Indictment. Exposure to the original indictment, including the duplicitous charging, was, therefore, innocuous and cumulative of

51

information properly before the jury. The district court specifically found that the exposure of any juror to the unredacted indictment would not have provided that juror with factual information to which the juror did not already properly have access, nor would it have provided that juror with any legal knowledge different from that provided to the jury as a whole.

Furthermore, the jury was repeatedly instructed that the indictment was not evidence of guilt, and that it must decide the case solely on the evidence properly admitted during the trial. The jury is presumed to follow the district court's instructions. *See United States v. Shenberg*, 89 F.3d 1461, 1472 (11th Cir. 1996).

Based upon the district court's investigation of this claim, its careful review of the nature, source and use of the extrinsic information in the context of the substantial evidence of defendants' guilt, we hold that the district court did not abuse its discretion in denying defendants a new trial for this reason.

3. Exposure to Limited Portions of Media Coverage

During the hearing, Jurors 7, 22, and 40 revealed that they had inadvertently experienced limited exposure to some media coverage during the trial. These jurors testified that, despite their best efforts, they had overheard snippets of television coverage or seen headlines regarding the case in newspapers or online. The court found that such limited, inadvertent exposure was not surprising given

52

the intense media scrutiny of the trial. The court further found that the jurors' testimony was especially credible since it was clear to it that the jurors felt compelled to disclose even the most incidental and inadvertent exposure to extrinsic information. Juror 22 testified that she would leave the room or mute the television when the news came on, and Jurors 7 and 40, who saw headlines, testified that they did not read the accompanying stories prior to the verdict. The court also found that there was no evidence that the jury discussed any media reports prior to the verdict.

Our review of the record supports these findings and the district court's conclusion that the exposure of these jurors to media reports about the trial was harmless. In view of the limited and incidental nature of this exposure and the substantial evidence of defendants' guilt on the counts of conviction, we hold that the district court did not abuse its discretion in denying the defendants a new trial for this reason.

B.     Juror Deliberations

Defendants rely upon purported emails allegedly exchanged between jurors during trial and deliberations. Documents said to be copies of such exchanges were mailed anonymously to the defense, to argue that there was both premature jury deliberation and deliberation by fewer than all the jurors in this case, and that

53

this improper deliberation denied the defendants of their Sixth Amendment right to an impartial jury.

These allegations posed a very different problem for the district court from those suggesting that the jury had been subject to external influences. District courts are subject to very stringent limitations on their authority to question jurors about their deliberations, and to use one or more juror's testimony to impeach the verdict of all. In fact, for nearly a century, the Supreme Court has recognized a near-universal and firmly established common-law rule *flatly prohibiting* the use of juror testimony to impeach a verdict. *Tanner v. United States*, 483 U.S. 107, 117 (1987); *McDonald v. Pless*, 238 U.S. 264 (1915).

The Court has repeatedly emphasized the important policy considerations that require the shielding of juries from public scrutiny of their deliberations. *Williams v. Florida*, 399 U.S. 78, 100 (1970). "The essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Id.* Because our system of justice so prizes this unique and essential feature of our criminal justice system, it both anticipates and tolerates some level of imperfection in the system. *United States v. D'Angelo*, 598 F.2d 1002, 1004-05

& n.4 (5th Cir. 1979).[33]  As the Supreme Court has explained:

> There is little doubt that postverdict investigation into juror
> misconduct would in some instances lead to the invalidation of
> verdicts reached after irresponsible or improper juror behavior.  It is
> not at all clear, however, that the jury system could survive such
> efforts to perfect it.  Allegations of juror misconduct, incompetency,
> or inattentiveness, raised for the first time days, weeks, or months
> after the verdict, seriously disrupt the finality of the process.
> Moreover, full and frank discussions in the jury room, jurors'
> willingness to return an unpopular verdict, and the community's trust
> in a system that relies on the decisions of laypeople would all be
> undermined by a barrage of postverdict scrutiny of juror conduct.

*Tanner*, 483 U.S. at 120-21 (internal citations omitted).

Permission to attack jury verdicts by postverdict interrogations of jurors would allow defendants to launch inquiries into jury conduct in the hope of discovering something that might invalidate the verdicts against them.  "Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict."  *Id.* at 119-20 (quoting *McDonald*, 238 U.S. at 267-68)).  Such events would result in "the destruction of all frankness and freedom of discussion" in the jury room.  *Id.*  And, as early as 1892, the Supreme Court expressed concern that such postverdict investigation would "induce tampering with individual jurors

---

[33]For example, we permit logically inconsistent jury verdicts as to different counts, and even as to different co-defendants.  We permit jury nullification.  We do not inquire whether a verdict is the result of compromise, mistake or even carelessness.

subsequent to the verdict." *Mattox v. United States*, 146 U.S. 140, 149 (1892). In a justice system that depends upon public confidence in the jury's verdict, such events are unacceptable.

In an effort to protect the jury system, the Federal Rules of Evidence enshrine the common law rule against the admission of a juror's testimony to impeach the jury's verdict. Rule 606(b) provides:

> (b) **Inquiry into validity of verdict or indictment**. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed. R. Evid. 606(b).

By disallowing a juror to impeach the jury's verdict by testimony about their deliberations, the rule operates to protect jurors from postverdict investigation and to protect the verdict from endless attack.[34]

---

[34]The only exception to the rule is to permit the sort of examination of jurors conducted by the district court in this case to determine whether the jury considered extrinsic information to the defendant's prejudice, as discussed in the immediately preceding portion of this opinion. The

We have previously affirmed district courts that have denied motions for a new trial while declining to conduct investigations into jury deliberations. *Cuthel*, 903 F.2d at 1381. In *Cuthel*, we held that the district court did not abuse its discretion in failing to conduct an evidentiary hearing despite evidence of premature deliberations by the jury and evidence of intrajury pressure to reach a verdict. *Id.* at 1383; *see also United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984) (duty to investigate arises only in the context of extrinsic influence); *United McElroy by McElroy v. Firestone Tire & Rubber Co.*, 894 F.2d 1504, 1511 (11th Cir. 1990) (denying defendant's requests to interview the jury members based on allegations of improper deliberations).

The district court said that it had serious reservations about the authenticity of these purported emails, but concluded that the law barred it from questioning the jurors about their deliberations, or about the emails purporting to suggest that the jurors deliberated improperly.[35] Instead, it stated that "[e]ven if the Court were

district court found as a matter of fact that it had "no doubt whatsoever that the documents purporting to be juror emails on which the Defendants rely are wholly unrelated to any evidence of jury exposure to extraneous information or outside influence." We conclude that this finding of fact is not clearly erroneous. In addition, we see no abuse of discretion in the way the district court dealt with the three other emails called to its attention after the evidentiary hearings.

[35]Defendants urged the court to obtain information regarding the emails from the jurors' internet providers but provided the court with no legal authority in support of this "unusual and intrusive investigation of jurors." In view of the law governing postverdict investigation of jurors, the court denied the request.

to assume *arguendo* the authenticity of these documents," it would not find that the emails established that the jury either deliberated prematurely or without all its members in any significant measure.

The court based this conclusion upon its factual findings that some of the emails might relate to discussion of the case prior to the submission of the case to the jury, that others might indicate limited deliberation by fewer than all the members of the jury, and that some indicate possible consideration of penalties faced by the defendants. According to the district court, this was the most that the emails showed.

The court concluded that, while "it is unquestionably clear that such discussions constitute misconduct, it is not the sort of conduct that this Court can or should directly inquire into by interrogating jurors, nor is it in this Court's view grounds for granting a new trial." Considering the totality of the circumstances, the strength of the government's case, the length of jury deliberations, and the court's instructions to the jury, including the instructions not to decide or discuss the case prematurely, the district court held that there was no reasonable possibility that the defendants suffered prejudice from any premature deliberations, discussion of penalty, or deliberation with fewer than all the members of the jury present.

We agree. Additionally, we note that the verdict in this case was split in that Siegelman was acquitted of many of the charges.[36] Such a split verdict lends supports to a conclusion that the jury carefully weighed the evidence and reached a reasoned verdict free of undue influence and did not decide the case prematurely. *United States v. Dominguez*, 226 F.3d 1235, 1248 (11th Cir. 2000); *Cuthel*, 903 F.2d at 1383.

We conclude, therefore, that the district court did not abuse its discretion in deciding that the purported emails, assuming they are authentic, do not entitle defendants to a new trial. The district court applied the relevant factors to the email evidence, and was well within its discretion to conclude that they did not demonstrate premature deliberation or deliberation with fewer than all jury members sufficient to arise to a constitutional violation.[37]

6.    *District Court Failure to Recuse*

Scrushy contends that he is entitled to a new trial because Chief Judge Fuller should have disclosed his "extraordinary extrajudicial income from business

---

[36]Scrushy argues that because he was convicted on all counts against him, that the verdict was not split as to him. The law, however, is to the contrary. *See United States v. Baker*, 432 F.3d 1189, 1237 (11th Cir. 2005) (a split verdict is one in which the jury finds "guilt as to some defendants or charges but not as to others").

[37]Defendants moved just before oral argument for permission to file supplemental information regarding juror misconduct. At oral argument, the government represented to the court that its investigation into that misconduct did not involve the allegations of juror misconduct at issue in this appeal. For this reason, we shall deny the motion.

contracts with the United States Government pursuant to 28 U.S.C. § 455(a)." This claim is predicated upon Chief Judge Fuller's ownership interest in two aviation companies that engage in business with agencies of the United States government. This claim was raised over nine months after trial and incorporated information learned from the internet and from Chief Judge Fuller's Financial Disclosure Reports.

A motion for recusal based upon the appearance of partiality must be timely made when the facts upon which it relies are known. The untimeliness of such a motion is itself a basis upon which to deny it. *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1472 (11th Cir. 1986). The rule has been applied when the facts upon which the motion relies are public knowledge, even if the movant does not know them. *See National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953, 957-59 (2d Cir. 1978). The purpose of the rule is to "conserve judicial resources and prevent a litigant from waiting until an adverse decision has been handed down before moving to disqualify the judge." *Summers v. Singletary*, 119 F.3d 917, 921 (11th Cir. 1997).

Scrushy's recusal motion was untimely, based upon information readily available to him prior to trial, and has all the earmarks of an eleventh-hour ploy based upon his dissatisfaction with the jury's verdict and the judge's post-trial

60

rulings. It has no merit.

7.    *Jury Selection Procedures*

Federal criminal defendants have both a statutory and a constitutional right to a grand and a petit jury selected at random from a fair cross-section of their community. Juror Selection and Service Act of 1968, 28 U.S.C. §§ 1861-1869 (the "JSSA"); U.S. Const. amend. VI. By its terms, the JSSA provides remedies for only a "substantial failure to comply" with its requirements for jury selection procedures that are random, objective, and that produce a jury that is a fair-cross section of the community. 28 U.S.C. § 1861 and 1867(d). Mere technical deviations from the JSSA's requirements do not violate the JSSA if they do not result in impermissible discrimination in the jury selection process. *United States v. Gregory*, 730 F.2d 692, 699 (11th Cir. 1984).

Before their trial, both Siegelman and Scrushy filed virtually identical motions, alleging that the Middle District of Alabama committed substantial violations of the JSSA in constructing its Qualified Jury Wheels in 2001 and 2005, and in the selection from those wheels of both their grand and petit juries. Defendants claimed that these violations resulted in their juries being not a fair-cross section of their community. Specifically, Scrushy and Siegelman challenged the Middle District's liberal deferral policy and its procedures for summoning

61

previously deferred jurors, claiming that they resulted in juries that under-represented African-Americans. The district court denied these challenges. Defendants appeal this denial.

Recently, a panel of this court has upheld the jury selection procedures of the Middle District of Alabama in a case raising virtually the same claims as those asserted here. *United States v. Carmichael*, ___ F.3d ___ (11ᵗʰ Cir. 2009). *Carmichael* held that the Middle District's jury selection procedures – including the liberal deferral policy and the procedures for summoning previously deferred jurors – did not substantially violate the JSSA. Additionally, *Carmichael* held that the Middle District's jury selection procedures did not result in the systematic under-representation of African-American jurors on the 2001 Qualified Jury Wheel or in the jury pools selected from that wheel. ___ F.3d at ___.

In his brief, which Siegelman adopted, Scrushy acknowledges the identity between the claims presented in *Carmichael* and his claims presented here, conceding that "[b]ut for the fact that only the petit jury which was drawn from the 2001 jury wheel was challenged there [the petit jury was drawn from the 2005 wheel here], the issues presented overlap." This is not surprising since the same expert who opined in *Carmichael* about alleged violations of the JSSA and the Constitution is relied upon here, using the same evidence in support of those

claims. At the time defendants filed their pre-trial motion, however, *Carmichael* had not yet been decided. Now that it has, it disposes of their claims as to the 2001 jury wheel.

With respect to the 2005 wheel, the district court in this case held that defendants were not entitled to any relief because the challenged objectivity and randomness practices did not apply to that wheel. Additionally, the district court found that defendants had not shown the absolute racial disparity between the composition of his juries and the community at-large of over 10% that is required to establish a statutory or constitutional violation. *See Carmichael*, ___ F.3d at ___; *see also United States v. Gresham*, 63, Fl3d 1074, 1078-79 (11th Cir. 1995). We agree.

Defendants' claims regarding the Middle District of Alabama's jury selection procedures are without merit and do not entitle them to any relief.

8.     *Siegelman's Sentence*

Siegelman contends that the district court's decision to grant an upward departure under U.S.S.G. §§ 2C1.1 cmt.n.5, 5K2.0 (2002) violated the First Amendment and 18 U.S.C. § 3553(a) because it was allegedly based on Siegelman's statements criticizing the prosecutors in and the prosecution of this

case. If this were true, we might agree.[38]  It does not, however, accurately describe the district court's reasons for the upward departure.

In both its written motion for an upward departure and its arguments at sentencing, the government maintained that Siegelman's criminal conduct reflected such a systematic and pervasive corruption of the office of Governor and Lieutenant Governor, as well as various state agencies, such as the CON Board, as to cause a loss of public confidence in the government of the State of Alabama. The government's motion focused on this allegation of systematic and pervasive corruption of state government.  The government contended that Siegelman "for over six years abused the Executive Branch of the state of Alabama."

The statute permits and the cases relied upon by the government uphold upward departures where the district court finds that there was pervasive corruption of a governmental function resulting in a loss of public confidence in state or local government.  *See* U.S.S.G. §§ 2C1.1 cmt.n.5, 5K2.0; *United States v. Shenberg*, 89 F.3d 1461, 1476-77 (11th Cir. 1996); *United States v. Reyes*, 239 F.3d 722, 744-45 (5th Cir. 2001).

Although the government did refer at sentencing to Siegelman's very public

---

[38]The government argues persuasively that, even if there was error here, it was harmless as the departure did not affect Siegelman's ultimate sentence.  As we need not, we do not reach this argument.

criticisms of the federal criminal justice system, including complaints of selective prosecution, there is no indication that the court based its upward departure decision on these attacks. In replying to Siegelman's counsel statement about saving the issue of alleged selective prosecution for another day, the court responded, "Then let's do that."

In considering the request for an upward departure "as set forth in the Government's motion," the district court found that Siegelman's conduct resulted in a loss of public confidence in the executive branch of Alabama government. The district court took judicial notice of the "plethora of media attention" to the case by the local and national media, and relied on this in finding that the case had severely undermined public confidence in Alabama state government.

Siegelman does not contend that an upward departure for his systematic and pervasive corruption of state government was inappropriate, and even his attorney at sentencing conceded that "certainly the argument could be made, in all candor, that there could be some question as to public confidence in this case."

The district court expressly stated that it was upwardly departing in order to "preserve the integrity of the judiciary and the confidence of the people of the state of Alabama in its elected officials." We find no abuse of discretion in the district court's upward departure in sentencing Siegelman.

## IV.

For the foregoing reasons, we conclude that Scrushy's convictions and sentence are due to be AFFIRMED. Siegelman's convictions on Counts 8 and 9 are due to be REVERSED. Siegelman's remaining convictions are due to be AFFIRMED. Siegelman's sentence is due to be VACATED in the light of our reversal of his convictions on Counts 8 and 9 of the indictment, and his case is remanded for resentencing.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED. All pending motions in this case are DENIED.

Exhibit A

First question: Did anyone other than another juror try to influence your thinking about this case or your vote on the substantive counts against any Defendant?

Second question: Do you have any reason to believe that any juror was subjected to attempts to influence his or her thinking about the case by anyone other than another juror?

Third question: Did anyone other than another juror attempt to discuss the case with you during the time you were a juror in this case?

Fourth question: During the time that you were serving as a juror did you view any news reports or other information relating to this case or to any Defendant from sources such as newspapers, magazine, radio, or television broadcasts or Internet sites?

Fifth question: During the time that you were serving as a juror did you view any materials from any books, newspapers, Internet sites or any other source relating to any witness, any legal issue, or any factual issue related to this case?

Sixth question: During the time that you were serving as a juror did you in any way attempt to independently investigate any facts or law relating to this case?

Seventh question: During the time that you were serving as a juror did you overhear any conversations between persons not on the jury or between non-jurors as to any member of the jury relating to this case?

Eighth question: During the time that you were serving as a juror did you view or hear any extraneous information about the penalty that might be applicable to any Defendant if he was convicted of the charges in this case?

Ninth question: During the time that you were serving as a juror did you obtain extraneous information from any source about your role as a juror, your jury service generally, or the role of the foreperson?

Tenth question: During the time that you served as a juror did any other juror say or do anything that caused you to believe that he or she may have been exposed to extraneous information as I have defined it about this case from any source?

Eleventh question: During the time that you were serving as a juror did you view or hear any extraneous information about either the law applicable to this case or any factual material relating to this case?

Twelfth question: Did you bring any documents in response to the subpoena relating to extraneous information?