**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 23-12038

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

RODRICK MAURICE HAMILTON,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cr-20224-RS-2

————————————

Before HULL, MARCUS, and WILSON, Circuit Judges.

MARCUS, Circuit Judge:

On September 29, 2019, at around 10 a.m., two males wearing masks entered a Grab-A-Snack Market convenience store in Miami, brandishing firearms. When one of the armed men jumped on top of the counter by the cash register, the store clerk grabbed

a firearm from underneath the counter and opened fire. The two suspects exchanged fire with the clerk. Multiple shots were discharged, and one of the two suspects sustained a gunshot wound. Both suspects then fled. An investigation conducted by the City of Miami and Miami-Dade Police Departments linked the defendant Rodrick Maurice Hamilton's car, clothes, and phone to the shootout. Hamilton, who told his girlfriend afterwards that he had gone to Georgia, was arrested in Miami several months later. He was indicted by a federal grand jury sitting in the Southern District of Florida.

Following a seven-day jury trial, Hamilton was convicted of conspiracy and an attempt to commit Hobbs Act robbery. The district court sentenced him to a 170-month term of imprisonment, followed by three years of supervised release.

Hamilton challenges both his convictions and ensuing sentence on multiple grounds. Among other things, he claims that the district court erred in giving the jury a flight instruction; that the government impermissibly commented during closing argument and rebuttal about his decision not to testify; that the district court abused its discretion in denying his motion for a new trial and in failing to conduct a jury inquiry based on one juror's post-verdict statement regretting his verdict; and, finally, that the district court erred by imposing a twenty-month upward departure under the Sentencing Guidelines without giving him advance notice.

After careful review of the record and with the benefit of oral argument, we can discern no error and affirm the judgment of the district court.

I.

A.

At trial, the government presented a variety of testimonial and physical evidence connecting Hamilton to the shoot-out at the Grab-A-Snack Market. Among other things, a Ford Explorer registered to Hamilton crashed into a building at an intersection a "few blocks" from the store about three minutes after the suspects fled the scene. When law enforcement officials responded to the accident, the car was still running, a piece of cardboard was discovered covering the car's license plate, and blood was found on the passenger side of the vehicle, along with a cellphone on the front passenger seat. The cellphone belonged to Hamilton.

At the time of the robbery, Hamilton was involved in a romantic relationship and lived with Pearlie Scott just around the corner from where his vehicle crashed. Although Hamilton was the registered owner of the Explorer, Scott was the primary driver. Hamilton only "[b]arely" drove it. But Hamilton took the car out the night before the robbery.

Scott did not see Hamilton again until the next day, when he approached their residence on foot coming from the direction of the car crash. She recalled that Hamilton was wearing the same jacket worn by one of the suspects seen on a video recording of the robbery as it unfolded at the Grab-A-Snack Market. Scott testified

that Hamilton was angry when she saw him that morning. He claimed the Ford Explorer had been involved in an accident, and he directed her to call the police and report the car as stolen. Scott called and reported the vehicle as having been stolen, although she knew at the time the claim was false. Hamilton left their home before the police arrived to investigate the "stolen" vehicle.

Later that evening, Hamilton contacted Scott, telling her that he "was sorry" and "was going to turn himself in." In a subsequent conversation, however, Hamilton told Scott that he was in Georgia.

Soon after the robbery, law enforcement officials arrested co-conspirator Untarius Alexander. His DNA matched the blood found at the Grab-A-Snack Market and in Hamilton's car. When he was arrested, Alexander had a wound consistent with a gunshot on the back of his right thigh and a small hard object (consistent with a bullet) lodged near his right knee. On Alexander's phone, the officers found a photograph taken a month before the robbery showing Alexander together with Hamilton. Hamilton was wearing the same jacket and pants seen worn by one of the suspects in the video of the robbery.

An examination of the telephone records for Alexander's and Hamilton's cellphones revealed that the day before the robbery, the two suspects exchanged eleven calls, one of which lasted more than sixteen minutes. And on the morning of the robbery, Alexander called Hamilton five times between 7:28 and 8:06 a.m. However, between August 19, 2019, and September 27, 2019, only

a single call was recorded between Alexander and Hamilton, and that lasted seven seconds. The day of the robbery, Alexander called Pearlie Scott four times and sent her seven text messages. Further, location data for the two cellphones established that Hamilton and Alexander were within close proximity of the Grab-A-Snack Market just minutes before the robbery occurred.

B.

In 2020, a federal grand jury in Miami indicted Hamilton and Alexander, charging them with conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 1), attempt to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 2), and brandishing and discharging a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and (iii) (Count 3). The defendants proceeded to trial together and were convicted on all counts. Prior to sentencing, the district court granted the government's motion to dismiss Count 3, based on *United States v. Taylor*, 596 U.S. 845 (2022), which had narrowed the ambit of "crimes of violence" punishable under 18 U.S.C. § 924(c). Alexander, like Hamilton, was sentenced to a 170-month term of imprisonment, followed by a three-year term of supervised release.

Hamilton timely appealed his convictions and sentence.

II.

First, Hamilton argues that the district court abused its discretion in giving the jury a flight instruction. We review a district court's decision to give a particular jury instruction for abuse of discretion. *United States v. Maxi*, 886 F.3d 1318, 1332 (11th Cir.

2018) (citing *United States v. Williams*, 541 F.3d 1087, 1098 (11th Cir. 2008) (per curiam)).  We will not reverse for an error in jury instructions "unless there is a reasonable likelihood that it affected the defendant's substantial rights." *United States v. Wright*, 392 F.3d 1269, 1277 (11th Cir. 2004) (citation modified).

For many years our case law has been clear that evidence of flight or concealment may be admissible to establish consciousness of guilt.  *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977).[1] The instruction may be given when the evidence could lead a reasonable jury to find that the defendant fled in order to avoid apprehension for the charged crime.  *See Williams*, 541 F.3d at 1089.  In *Myers*, the former Fifth Circuit explained that the probative value of flight as circumstantial evidence of guilt "depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."  550 F.2d at 1049.  We've indicated that a district court does not abuse its considerable discretion by giving a jury a flight instruction if it tells the jury that it must determine whether the

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.  *Id.* at 1209.

evidence proved flight and explains to the jury "the potential weaknesses in the *Myers* chain of inferences." *United States v. Borders*, 693 F.2d 1318, 1328 (11th Cir. 1982).

On the record before us, there was ample reason for the district court to instruct the jury that it could consider flight since the evidence established that Hamilton had fled to Georgia soon after the failed robbery at the Grab-A-Snack Market. The jury learned that after Hamilton had fled from the store, he crashed his Ford Explorer into a building. Thereafter, Hamilton left the scene of the accident, went home, and told his girlfriend Pearlie Scott that the vehicle had been involved in an accident. He then directed her to file a police report falsely claiming the vehicle had been stolen. He left their home before the police arrived to investigate the stolen vehicle report. That night, Hamilton told her he was sorry and he planned to turn himself in. But soon thereafter, Hamilton contacted his girlfriend again and told her he had left Florida and was in Georgia. From this body of evidence, a jury could reasonably find that Hamilton's flight established his consciousness of guilt.

Moreover, there was no error in the flight instruction given by the district court.[2] The court employed the Circuit's pattern instruction, telling the jury that it had to decide whether Hamilton's

---

[2] The district court instructed the jury this way:

> Intentional flight by a person during or immediately after a crime has been committed or after he is accused of a crime is not, of course, sufficient in itself to establish the guilt of that person.

conduct actually demonstrated flight and what weight it ought to give his conduct in light of all of the other evidence presented. *Borders*, 693 F.2d at 1328 (affirming where the court "correctly cautioned the jury that it was up to them to determine whether the evidence proved flight and the significance, if any, to be accorded such a determination"). Indeed, the district court explained that Hamilton's flight could have been for other reasons "fully consistent with innocence." Hamilton never raised any objection to the trial court's wording.

---

But intentional flight under those circumstances is a fact, which, if proved, may be considered by the jury in light of all the other evidence in the case in determining the guilt or innocence of that person.

Whether or not the defendant's conduct constituted flight is exclusively for you as the jury to determine.

And if you do so determine whether or not that flight showed a consciousness of guilt on his part, and the significance to be attached to that evidence are also matters exclusively for you as a jury to determine.

I remind you that in your conversation of any evidence of flight, if you should find that there was flight, you should also consider that there may be reasons . . . which are fully consistent with innocence.

These may include fear of being apprehended, unwillingness to confront the police, or reluctance to confront the witness.

And may I suggest to you that a feeling of guilt does not necessarily reflect actual guilt of a crime which you are considering.

Hamilton's claim that "[a]t the time he spoke with Pearlie Scott there was no evidence that law enforcement connected [him] to the robbery" misses the mark. The focal point is on the defendant's state of mind, not on the knowledge that law enforcement officers had at the time of the flight. *See United States v. Blakey*, 960 F.2d 996, 1001 (11th Cir. 1992) (affirming the admission of a flight instruction where "the evidence connect[ed] the circumstances of the flight with the *defendant's* consciousness of guilt" (emphasis added)). When Hamilton fled, the jury could reasonably find he knew that he had just committed an armed robbery, that there had been a shoot-out, that his confederate had been injured, that Alexander's blood had splashed all over Hamilton's car, that his car would be found by the police having crashed shortly after the robbery just around the corner from his home, and that his cellphone had been left in the car. After apologizing to Scott for what had happened, he contacted her later only to tell her that he had left the state.

Nor does it matter if his involvement in the filing of a false police report may have provided an alternate explanation for his flight. The issue was fairly for the jury to decide and plainly there was enough evidence to allow it to find that he fled in order to conceal his involvement in the violent robbery attempt. What's more, the flight instruction actually given afforded Hamilton ample opportunity to offer the jury an alternative explanation for his flight.

In any event, even if the district court abused its discretion in giving the instruction -- and we can discern no error -- there is

no reasonable likelihood that the instruction affected Hamilton's substantial rights. *See Wright*, 392 F.3d at 1277. There was ample independent evidence establishing Hamilton's guilt beyond a reasonable doubt. First, the Ford Explorer crashed into a building only two blocks from Hamilton's residence, only three minutes after the robbers fled the store; the vehicle was registered to Hamilton and contained Alexander's blood on the passenger seat. Second, the vehicle's license plate had been covered with a piece of cardboard, affording the reasonable inference that the driver (and registered owner) wanted to avoid being linked to the vehicle. Third, law enforcement officials found Hamilton's phone inside the getaway car, and Scott testified that to the best of her knowledge, Hamilton was the last person to possess the vehicle prior to the robbery. Fourth, historical cell site location data placed Hamilton and Alexander in close proximity to each other and to the scene of the robbery. Fifth, between August 19, 2019, and September 27, 2019, Alexander and Hamilton had only a single phone call that lasted seven seconds, but within twenty-four hours of the robbery, there were sixteen calls between Alexander and Hamilton, consistent with the inference that the co-conspirators coordinated the plan to effect the robbery. Sixth, a surveillance video of the attempted robbery taken from the Grab-A-Snack Market revealed that one of the suspects wore distinctive black pants with gray/silver stripes and a jacket -- pants that were identical to those Hamilton wore in a photograph extracted from Alexander's phone, and a jacket that Pearlie Scott recalled seeing Hamilton wear soon after the robbery. And, finally, Scott testified that Hamilton directed her to falsely claim

that his car had been stolen and later told her he was "sorry" and that "he was going to turn himself in." There was, in short, powerful evidence of Hamilton's guilt, all of which was wholly independent of the flight instruction.

III.

Hamilton argues next that his convictions should be reversed because the government impermissibly commented during its closing argument and in rebuttal about his decision not to testify, in violation of the Fifth Amendment. We remain unpersuaded. We review issues of prosecutorial misconduct *de novo*. *United States v. Noriega*, 117 F.3d 1206, 1218 (11th Cir. 1997).

Prosecutorial misconduct during closing argument will yield a new trial only where the remarks were improper and prejudiced the defendant's substantive rights. *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999). In order to assess the prejudicial effect of the comments, we evaluate them in the context of the trial as a whole and assess their probable effect on the jury. *United States v. Hernandez*, 145 F.3d 1433, 1438 (11th Cir. 1998). Any potential for prejudice is diminished by a court's explicit instruction that the government bears the burden of proof beyond a reasonable doubt in a criminal case. *Id.* at 1439.

A prosecutor impermissibly comments on a defendant's right to testify where: "(1) the statement was *manifestly intended* to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to

testify." *United States v. Knowles*, 66 F.3d 1146, 1162–63 (11th Cir. 1995) (citation modified). A comment on the failure of the defense, rather than the failure of the defendant to explain or rebut evidence does not violate the defendant's Fifth Amendment privilege. *Hernandez*, 145 F.3d at 1439.

The comments at issue in this case arose when, during closing argument, the prosecutor said that Hamilton's phone was in the "get-away vehicle" and that "[t]he only reasonable explanation for that phone being in the vehicle is that Rodrick Hamilton took it in there with him." Hamilton did not object to this statement. Later, the government asked: "If Hamilton had nothing to do with the robbery and wasn't driving around in the get-away car, how could he have possibly known that that vehicle had been in an accident?" Again, Hamilton did not object. Then the government made the following "offending" comment:

> And again, what possible explanation is there for telling Pearlie Scott to falsely report the car stolen if Hamilton wasn't even involved? If it really was stolen, wouldn't it make sense for Rodrick Hamilton to call the police himself, explain to them what happened? If his phone somehow was in the car without him knowing, he could have borrowed Pearlie Scott's phone to tell the police what happened?

Hamilton objected, but the court overruled his objection.

During rebuttal, the government made the second challenged statement:

> But even if we didn't call Pearlie Scott as a witness at all, there is still overwhelming circumstantial evidence of Rodrick Hamilton's guilt. There's been no reasonable explanation offered for how the car got out of his possession. There's no reasonable explanation for why his cell phone would have been in the car if it wasn't for him.

Hamilton objected again, accusing the government of "[b]urden shifting." Again the court overruled his objection.

A new trial is not warranted because the prosecutor's comments did not impermissibly shift the burden of proof to Hamilton. Notably, the remarks Hamilton complains about do not amount to commentary about the defendant's decision not to testify. Indeed, they do not mention Hamilton at all, let alone his decision not to testify. The prosecutor's comments were drawn from the evidence in the record. They may be reasonably viewed as "comment[s] on logical inferences from all of the evidence rather than an argument requiring a negative inference from the defendant's failure to testify." *United States v. Rutkowski*, 814 F.2d 594, 597 (11th Cir. 1987) (deeming the prosecutor's statement -- "there is no explanation for anybody being on that plane who didn't know what was going on" -- to be a logical inference from the evidence); *see also United States v. Norton*, 867 F.2d 1354, 1364 n.10 (11th Cir. 1989) (deeming the prosecutor's questions at closing argument -- "Is any other explanation reasonable? Not that you heard one, but is any other explanation reasonable?" -- to be logical inferences from the evidence).

In short, there is no indication the prosecutor's statement was manifestly intended to be a comment about the defendant's failure to testify, nor was the statement of such character that a jury would "naturally and necessarily" take it to be a comment about the accused's failure to testify. *Knowles*, 66 F.3d at 1162–63 (citation modified).

As for a claim of substantial prejudice, the allegedly improper comment must have "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991) (citation modified). Again, any claimed prejudice concerning burden-shifting is diminished by the court's explicit instructions concerning who carries the burden of proof and how high that burden is in a criminal case. *Hernandez*, 145 F.3d at 1439; *United States v. Simon*, 964 F.2d 1082, 1086–87 (11th Cir. 1992); *United States v. Lopez*, 898 F.2d 1505, 1511 (11th Cir. 1990).

Even if there were error -- and we can find none -- it would have been rendered harmless by the district court's clear instructions that the government bore the burden of establishing the defendant's guilt beyond a reasonable doubt, and that burden never shifted from the government. These instructions were given to the jury twice, first at the outset of the trial and again before the jury began its deliberations. The district court instructed the jury that it must base its ruling only on the evidence, that what the lawyers say is not evidence, that the defendant does not have to prove his innocence or even testify, and that if a defendant chooses not to

23-12038                 Opinion of the Court                 15

testify, a jury may draw no inference from that decision.[3] *See Simon*, 964 F.2d at 1086–87; *Hernandez*, 145 F.3d at 1439.

We add that after the court rejected Hamilton's objection, the defendant did not ask for any curative instruction, even when the court expressly afforded him the opportunity. Again, the circumstantial case against Hamilton was very substantial. There is no reasonable probability that any claimed error in the prosecutor's isolated comments, when viewed in the context of the entire case, "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Eyster*, 948 F.2d at 1206 (citation modified).

---

[3] After closing argument, the court gave the jury these additional instructions, repeating much of what it had said at the start of the case:

> You must decide whether the Government has proved the specific facts necessary to find each defendant guilty beyond a reasonable doubt.

> Your decision must be based only on the evidence presented here during the trial.

> . . . .

> The law presumes every defendant is innocent.

> The defendant does not have to prove his innocence or produce any evidence at all. A defendant does not have to testify; and if the defendant chose not to testify, you cannot consider that in any way while making your decision.

> The Government must prove guilt beyond a reasonable doubt; if it fails to do so, you must find the defendant not guilty.

IV.

Hamilton also argues that the district court erred in denying his motion for a new trial and plainly erred in failing to conduct an inquiry based on a juror's post-verdict statement expressing regret about his verdict.  The evidence that Hamilton offers of juror misconduct is found in a juror's answer to a court questionnaire returned to the court after the jury verdict had been received.  The offending comment came in response to the following question: "DO YOU HAVE ANY RECOMMENDATIONS AS TO HOW WE MAY IMPROVE OUR SERVICES?"  Juror No. 12 answered this way:

> Yes, your Honor it was not clearly explained about the una[nimous] voting of guilty or not guilty.  I thought we all had to agree or deliberations would've continued.  It was never explained about a hung jury if we all didn't agree.  I truly felt Mr. Hamilton wasn't guilty.  I don't know the law that well. However, I wished I would've stuck to my guns and allowed another jury to try him.  My deepest apologies.

We review a district court's decision not to grant a new trial based on alleged juror misconduct for abuse of discretion.  *United States v. Siegelman*, 640 F.3d 1159, 1181 (11th Cir. 2011).  However, if a defendant fails to raise an issue before the district court, we review only for plain error.  *See United States v. Chau*, 426 F.3d 1318, 1321–22 (11th Cir. 2005) (per curiam).  To establish plain error, the defendant must show (1) an error, (2) that is plain, and (3) that affected his substantial rights.  *United States v. Turner*, 474 F.3d 1265,

1276 (11th Cir. 2007). If the defendant satisfies these conditions, we may exercise our discretion to recognize the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

"Plain" is a term "synonymous with 'clear' or, equivalently, 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734 (1993). An error is not plain unless the explicit language of a statute or rule specifically resolves the issue or there is precedent from the Supreme Court or us directly resolving it. *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003) (per curiam). We have "repeatedly recognized" that "an error cannot meet the 'plain' requirement of the plain error rule if it is not clear under current law." *Chau*, 426 F.3d at 1322 (citation modified).

"The jury must determine guilt solely on the basis of the evidence presented at trial and the court's instructions as to the applicable law." *Siegelman*, 640 F.3d at 1182. At the same time, the Supreme Court has recognized "a near-universal and firmly established common-law rule *flatly prohibiting* the use of juror testimony to impeach a verdict." *Id.* at 1185 (citation modified). The rule is codified in Federal Rule of Evidence 606(b)(1), which reads this way:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may

not receive a juror's affidavit or evidence of a juror's statement on these matters.

There are three limited exceptions to this general rule. A juror may testify about whether: (1) extraneous prejudicial information was improperly brought to the jury's attention; (2) an outside influence was improperly brought to bear on any juror; or (3) a mistake was made on the verdict form. Fed. R. Evid. 606(b)(2). In *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017), the Supreme Court added a fourth exception "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Id.* at 225. Outside of these limited exceptions, "Rule 606(b) prohibits inquiry into a wide range of alleged misconduct," including whether a juror misunderstood the court's instructions or "thought that the jury would be kept out indefinitely until agreement was reached." *United States v. Brown*, 934 F.3d 1278, 1302 (11th Cir. 2019) (citation modified).

The district court did not abuse its discretion in denying Hamilton's motion for a new trial based on the juror's post-verdict statement. And since Hamilton never objected to the court's failure to make any inquiry of the juror we review that claim only for plain error. We can find none.

The juror's answer to the court's questionnaire provides no basis for questioning him further. Rule 606(b), as we've noted, bars any inquiry into the juror's mental process in reaching the verdict. Hamilton does not argue that any of Rule 606(b)'s four recognized exceptions apply here. Fed. R. Evid. 606(b)(1)–(2); *Pena-Rodriguez*,

580 U.S. at 225; *Siegelman*, 640 F.3d at 1185. Juror No. 12's statement that he misunderstood the district court's instruction on unanimity and thought "deliberations would've continued" are exactly the kinds of statements we've recognized cannot be probed. *Brown*, 934 F.3d at 1302 (prohibiting inquiry into a juror's statement that he "misunderstood" or "thought that the jury would be kept out indefinitely until agreement was reached" (citation modified)); *see also United States v. Jones*, 132 F.3d 232, 246 (5th Cir. 1998) (persuasive authority) ("Jury deliberations entail delicate negotiations where majority jurors try to sway dissenting jurors in order to reach certain verdicts or sentences. An individual juror no longer exposed to the dynamic offered by jury deliberations often may question his vote once the jury has been dismissed.").

Because none of the four exceptions applies, Hamilton asks us to recognize an "additional exception," based on *Ramos v. Louisiana*, 590 U.S. 83 (2020). The argument is misplaced. In *Ramos*, the Supreme Court held that the Sixth Amendment requires a unanimous verdict to convict a criminal defendant of a serious offense, invalidating as unconstitutional a Louisiana and an Oregon practice permitting 10-to-2 verdicts. *Id*. at 93. *Ramos* has nothing to do with the no-impeachment rule. Instead, *Ramos* emphasized that unanimity has always been required in the federal system, *id.*, -- including in 1975, when Rule 606(b) was adopted and endorsed a broad no-impeachment rule, Pub. L. No. 93-595, 88 Stat. 1926 (Jan. 2, 1975). No court has ever suggested that Rule 606(b) conflicts with this long-standing federal requirement of juror unanimity.

20                    Opinion of the Court                    23-12038

As the Court explained in *Pena-Rodriguez*, Rule 606(b) furthers the goal of unanimity, in that it

> [P]romotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict.

580 U.S. at 218. Furthermore, in establishing a new exception based on the "imperative to purge racial prejudice from the administration of justice," *id*. at 221, the Court confirmed the vital importance of the no-impeachment rule. It protects "verdict finality" and assures jurors that "once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations," *id*. at 211. As we've recognized, the Supreme Court has repeatedly rejected attempts to circumvent the no-impeachment rule embodied in Rule 606(b). *See Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1271–72 (11th Cir. 2022); *see also Warger v. Shauers*, 574 U.S. 40, 44–48 (2014) (holding that Rule 606(b) prohibited introduction of evidence that a juror lied during voir dire); *Tanner v. United States*, 483 U.S. 107, 125–27 (1987) (holding that Rule 606(b) prohibited inquiry into alleged juror intoxication during deliberations and that other procedural safeguards in the trial process protected the defendant's Sixth Amendment right to a fair trial).

The "additional exception" offered by Hamilton would completely undermine the core purposes of the no-impeachment

rule by allowing inquiry into the purely internal matters of the jury's deliberations and into the mental process of each juror. No verdict would ever be truly final. Hamilton's case presents a particularly poor record for creating this kind of exception. In unambiguous language, the district court instructed the jury that its verdict had to be unanimous, that its deliberations would be secret, and that the jurors would never have to explain their verdict to anyone. The court also stressed that no juror should "give up [his] honest beliefs just because others think differently or because [he] simply want[s] to get the case over with." Hamilton never asked for a curative instruction, even when the court specifically asked if any party wanted additional instructions.

During the jury's two hours of deliberations, there were no jury notes, let alone a note indicating that the jurors were having trouble reaching a verdict, or that any of them did not understand the court's instructions. And, after the verdict was read aloud, the jury was polled, and each juror was individually asked "[i]s the verdict as read your true verdict." Juror No. 12 confirmed that he agreed with the verdict and he showed no hesitation. That twelve days later, the juror expressed regret about his decision is not unprecedented. In the face of the court's unambiguous instructions and in the absence of any indicia of hesitation, the juror's note casts no doubt on the legitimacy of the verdict.

Hamilton has cited no authority establishing that the trial court had an obligation to spontaneously inquire into Juror No. 12's statement. The law powerfully counsels the other way.

Hamilton has shown no error, let alone plain error, since there is no evidence of any extrinsic influence on the jury. And for the same reasons, we can discern no basis for setting aside the jury's verdict and granting Hamilton a new trial.

## V.

Hamilton's last argument is that the district court erred both procedurally and substantively in sentencing him to twenty months above the range recommended by the Sentencing Guidelines. We normally review a claim of procedural error in a sentence for abuse of discretion; if the defendant did not object to an alleged error at the sentence hearing, however, we review only for plain error. *United States v. Waters*, 937 F.3d 1344, 1358 (11th Cir. 2019). We also consider the substantive reasonableness of a sentence under the abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). A party challenging a sentence bears the burden of proving that the sentence is unreasonable in light of the record, the factors listed in 18 U.S.C. § 3553(a),[4] and the substantial

---

[4] The § 3553(a) factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence; (4) the need to protect the public; (5) the need to provide the defendant with educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) the pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

deference afforded the sentencing court. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015).

When reviewing a sentence, we must:

> [F]irst ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range.

*Gall*, 552 U.S. at 51.

A district court may impose a sentence above the guideline range in one of two ways -- as a departure or as a variance. The relevant version of the Guidelines explains a departure in this way:

> If reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted. . . . The information . . . may include information concerning . . . : [p]rior sentence(s) not used in computing the criminal history category . . . ; [and] [p]rior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions . . . .

U.S.S.G. § 4A1.3(a)(1), (2) (2023).  A departure "is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines, including the departure provisions."  *United States v. Hall*, 965 F.3d 1281, 1295 (11th Cir. 2020) (citation modified).  A variance, by contrast, "is a sentence imposed outside the guidelines range when the court determines that a guidelines sentence will not adequately further the purposes reflected in 18 U.S.C. § 3553(a)."  *Id.* (citation modified).

"Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure."  Fed. R. Crim. P. 32(h).  We've held that "[a] court must give the parties advance notice if it is considering *departing* from the guidelines range calculated in the PS[I], but it need not give advance notice if it is considering *varying* from that range."  *Hall*, 965 F.3d at 1295–96 (citing *Irizarry v. United States*, 553 U.S. 708, 714–15 (2008)).

Hamilton argues that the district court erred at sentencing by upwardly departing under U.S.S.G. § 4A1.3 without giving him advance notice under Rule 32(h).  However, in district court, he objected only to the departure itself, not to the lack of notice, so we review this claim only for plain error.  *See Waters*, 937 F.3d at 1358.  But regardless of how we review the claim and regardless of whether the court imposed a departure or a variance, the court was

entitled to do either, afforded sufficient notice, and, most importantly, would have imposed the same above-guideline sentence no matter the sentencing device.

We recognize that the record is murky about whether the district court intended to impose a twenty-month upward departure under § 4A1.3, or a twenty-month upward variance based on its consideration of the § 3553(a) factors -- the district court used both terms interchangeably. In this case, this is a distinction without a difference. To the extent Hamilton argues that the district court plainly erred by imposing a departure under § 4A1.3 without notice, the record refutes this claim. As we've observed, additional notice is only required where the court is departing *"on a ground not identified for departure . . . in the presentence report."* Fed. R. Crim. P. 32(h) (emphasis added). Hamilton concedes that the PSI expressly identified § 4A1.3 as a potential ground for upward departure, as did the original PSI completed months earlier. Hamilton's attorney even acknowledged at sentencing that there was a "departure provision" that would allow the court to address its concerns about Hamilton's criminal history. Since § 4A1.3 was identified as a ground for departure in the PSI, Rule 32(h) did not require the district court to give Hamilton any additional notice that it was contemplating a departure. Hamilton has shown no error, let alone plain error. And of course, no notice was required if the district court was considering varying from the guideline range.

Further, Hamilton cannot demonstrate that, even if the court erred, his substantial rights have been affected. *See Turner*,

474 F.3d at 1276. The record is clear that the district court intended to impose the same above-guideline sentence, whether through a departure or a variance, because it concluded that the PSI did not adequately account for the need for deterrence or to protect the public. In imposing sentence, the district court said this:

> The public has a right to be protected.
>
> The Court has considered the statements of all the parties, the presentence report which contains the advisory guidelines and the statutory factors set forth in 18 United States Code Section 3553(a).
>
> Based on the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, the court has determined that a sentence above the advisory guidelines range is appropriate for the reasons just stated.

Throughout the proceeding, the district court gave no indication it would have imposed any other sentence, and it recited several § 3553(a) factors to justify increasing Hamilton's sentence by twenty months. *See United States v. Barner*, 572 F.3d 1239, 1248 (11th Cir. 2009) ("A Sentencing Guidelines miscalculation is harmless if the district court would have imposed the same sentence without the error.").

Finally, Hamilton has not shown that his above-guideline sentence was substantively unreasonable. As we've said many

times, we measure the substantive reasonableness of a sentence against the § 3553(a) factors and "the totality of the circumstances." *See, e.g.*, *United States v. Irey*, 612 F.3d 1160, 1189–90 (11th Cir. 2010) (en banc); *United States v. Pugh*, 515 F.3d 1179, 1191–92 (11th Cir. 2008). A sentencing court would abuse its "considerable discretion" only if it "(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Rosales-Bruno*, 789 F.3d at 1256-*Bruno*, 789 F.3d at 1256 (11th Cir. 2015) (quoting *Irey*, 612 F.3d at 1189).

The sentencing court has wide discretion to decide whether the § 3553(a) factors justify a variance. *United States v. Rodriguez*, 628 F.3d 1258, 1264 (11th Cir. 2010), *abrogated on other grounds by Van Buren v. United States*, 593 U.S. 374 (2021). A major variance must be supported by more significant reasoning than a minor one, but the court need not discuss each factor in its justification. *Gall*, 552 U.S. at 50; *Irey*, 612 F.3d at 1195; *United States v. Sanchez*, 586 F.3d 918, 936 (11th Cir. 2009). And the district court can rely on factors in imposing a variance that it previously considered in calculating the guideline range. *Rodriguez*, 628 F.3d at 1265.

Here, the district court conducted a careful and "individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. The district court considered the statements of the parties, the PSI that contained the advisory guidelines and the statutory factors, and the record as a whole. Indeed, in fashioning its sentence, the

court considered the "very violent" nature of Hamilton's conduct, including that when he committed the armed robbery, he did not just carry or brandish a weapon, but he fired his gun at his victim. The court described at length Hamilton's extensive criminal history, and the degree to which his criminal history score failed to adequately address the risk that Hamilton would commit other crimes -- noting that Hamilton had "prior sentences not used in computing the criminal history category," including eight juvenile and two adult convictions that were not counted towards his criminal history score. The court added that Hamilton had repeatedly committed crimes for which he served prison terms -- referencing his prior four-year term of imprisonment for armed robbery/carjacking, criminal mischief, and unlawful possession of a firearm while engaged in a criminal offense, and his prior eight-year term of imprisonment arising from conviction for possession with intent to deliver cocaine. The court observed that his prior convictions and the substantial sentences that had been imposed did not stop him from committing still another violent armed robbery. *See, e.g.*, *United States v. Briggman*, 931 F.2d 705, 710 (11th Cir. 1991) (per curiam).

Plainly, the court took Hamilton's criminal history "very seriously" -- which, in addition to the convictions we've listed, included juvenile adjudications involving battery, throwing a deadly missile, aggravated battery with a firearm, attempted burglary of an unoccupied dwelling, attempted dealing in stolen property, and resisting an officer with violence, as well as adult convictions for

various drug offenses and armed burglary with assault or battery, aggravated battery with a firearm and mask, and being a felon in possession of a firearm. The trial court added that while it very rarely departed from the Guidelines, this case merited an above-guideline sentence. *See, e.g.*, *Rosales-Bruno*, 789 F.3d at 1254. The district court also factored into its calculus that Hamilton would be young enough upon release to commit further crimes, thus making a significant sentence necessary in order to deter and protect the public. And while the court mentioned that Hamilton had not shown remorse, we cannot say the court impermissibly relied on this factor. Rather, the court repeatedly cited Hamilton's extensive criminal history and the strong risk of recidivism as the bases for its sentence.

As for Hamilton's argument that no upward departure was justified since his advisory guideline range of 120 to 150 months already accounted for his criminal history, the district court expressly disagreed, concluding that, based on all of the facts and circumstances, an above-guideline sentence was warranted. The law allowed the trial court to do so, and Hamilton's difference of opinion does not establish an abuse of discretion. *See Rodriguez*, 628 F.3d at 1265. Finally, we note that the 170-month sentence was substantially below Hamilton's statutory maximum of twenty years each on Counts 1 and 2, a factor that also suggests "its reasonableness." *Rosales-Bruno*, 789 F.3d at 1256–57.

**AFFIRMED.**